# IN THE SUPREME COURT OF TENNESSEE
## AT NASHVILLE
### June 3, 2011 Session

## STATE OF TENNESSEE v. CHRISTOPHER LEE DAVIS

**Appeal by Permission from the Court of Criminal Appeals**
**Criminal Court for Trousdale County**
**No. 07-55      John D. Wootten, Jr., Judge**

---

**No. M2008-01216-SC-R11-CD - Filed October 17, 2011**

---

The defendant was convicted of aggravated robbery, carjacking, attempt to commit especially aggravated kidnapping, and attempt to commit first degree murder. At issue is the legality of the stop of a vehicle in which the defendant was a passenger, and whether the evidence is sufficient to support the defendant's conviction for attempt to commit first degree murder. We conclude that reasonable suspicion existed to permit the officers to conduct a brief investigatory stop of the car in which the defendant was a passenger. Further, we find there was sufficient evidence for the jury to conclude that the defendant and his fellow perpetrator planned and intended to kill the victim, and that the defendant's conduct, considered in light of the totality of the circumstances, constituted a substantial step sufficient to support a conviction for attempted murder. The judgment of the Court of Criminal Appeals is affirmed.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Criminal Appeals Affirmed; Case Remanded to the Criminal Court for Trousdale County**

SHARON G. LEE, J., delivered the opinion of the Court, in which CORNELIA A. CLARK, C.J., JANICE M. HOLDER, GARY R. WADE, and WILLIAM C. KOCH, JR., JJ., joined.

Comer L. Donnell, District Public Defender, William K. Cather, Assistant District Public Defender, Lebanon, Tennessee, for the appellant, Christopher Lee Davis.

Robert E. Cooper, Jr., Attorney General and Reporter; Gordon W. Smith, Associate Solicitor General; Benjamin A. Ball, Assistant Attorney General, Tom P. Thompson, District Attorney General; Jason L. Lawson, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## Factual and Procedural Background

On June 12, 2007, the victim, Glen McDaniel, drove his black 2001 Chevrolet Monte Carlo into a carwash bay in Hartsville, Tennessee. While Mr. McDaniel was washing his car, he saw a gold Nissan Maxima pull into the carwash and noticed that the two men in the back of the Maxima were staring at him. Mr. McDaniel continued washing his car until he was confronted by two African-American men wearing bandanas[1] over their faces who entered his carwash bay from opposite sides. The men wore red shirts and red hats, and one of them had a hat with a depiction of a $100 bill embroidered on it. Mr. McDaniel described one of them as approximately six feet, three or four inches tall and heavy set with dark skin. The other man, whom Mr. McDaniel identified at trial as being the defendant Christopher Lee Davis ("Defendant"), was nearly the same height but thinner and with a lighter complexion.

The larger man walked up to Mr. McDaniel, pointed a pistol at his chest, and told him to get into the Monte Carlo. Mr. McDaniel complied because he was afraid the man would shoot him if he refused. The man with the pistol got in the passenger seat and kept his gun pointed at Mr. McDaniel the entire time they were in the Monte Carlo. Defendant got in the back seat behind Mr. McDaniel and kept a grip on Mr. McDaniel's shoulders. The men asked for $800, and Mr. McDaniel replied that he did not have that much money on him and that he did not carry a wallet, but did have an ATM debit card. The men ordered him to drive across the street to an ATM.

The gunman walked Mr. McDaniel up to the ATM, and Defendant held his hand over one of the ATM video cameras. Defendant told Mr. McDaniel to get a receipt so they could make sure that he had withdrawn all of the money in his checking account. Mr. McDaniel completed the ATM withdrawal and gave the gunman the money and the receipt.

All three got back into the Monte Carlo, and Mr. McDaniel drove back to the carwash. As they approached, they saw Lacy Smotherman, an acquaintance of Mr. McDaniel, sitting in a parked car at the carwash, so the men told Mr. McDaniel to drive down the street. He did, and when they turned the car around and returned to the carwash, Ms. Smotherman was gone. Mr. McDaniel pulled his car into one of the carwash bays, and the men ordered him to get out of the car.

---

[1] In his statement to the police given the night of the robbery, Mr. McDaniel said that both men were wearing red bandanas. At trial, he stated that he might have been mistaken about the color of one of the bandanas and that it was possible that one man was wearing a red bandana and the other was wearing a black bandana.

Defendant pushed Mr. McDaniel against one of the walls in the carwash bay. Mr. McDaniel asked Defendant to take his car and leave him at the carwash, but Defendant refused, saying, "no, you're going to go with us." Mr. McDaniel testified that at this point, "I thought I was dead to be honest with you." He was standing with his chest pressed against the wall and Defendant was trying to pull his hands behind his back. Mr. McDaniel looked over his shoulder and saw that Defendant had a roll of black duct tape. Mr. McDaniel testified that "I yanked my hands right back up . . . 'cause I knew, you know, if I was duct taped I was done for." He struggled with Defendant, who shoved his face into the brick wall, injuring his nose and face, and hit him in the eye. Defendant said, "get the gun, we're going to shoot this motherfucker right here." Mr. McDaniel testified that during the incident Defendant appeared to be the one in control of the situation, giving orders and instructions to the other man.

Mr. McDaniel said that at this point, "I figured if I was going to get shot, I might as well try to run." He broke free from Defendant' grasp and ran toward a nearby restaurant. Defendant chased after him. The restaurant was closed. Mr. McDaniel ran around the side and headed for a gas station. He came to a steep embankment and jumped down the slope into the ditch. As he came over the other side and continued running toward the gas station, Mr. McDaniel saw his Monte Carlo pull out of the carwash. He also saw a black Chevrolet Impala pulling out at the same time. Mr. McDaniel reached the counter inside the gas station, told the attendant to call the police because he had just been carjacked and "those guys are trying to kill me," and collapsed from exhaustion. The attendant revived him, and the Sheriff's Department arrived a few minutes later. That night, Mr. McDaniel provided a written statement to law enforcement officers describing the incident.

The next day, Detective Chris Tarlecky of the Sumner County Sheriff's Department received information from Trousdale County law enforcement to "be on the lookout" ("BOLO") for the suspects in the carjacking and robbery. The BOLO dispatch contained the basic facts of the incident, described the stolen vehicle as a 2001 black Monte Carlo with custom wheels, provided a general description of the suspects, and identified the suspects' vehicle as a gold Maxima. Later that day the abandoned Monte Carlo was discovered at the Bledsoe Creek boat dock. Detective Tarlecky and another Sumner County Sheriff's Department officer drove to the boat dock.

Justin Scruggs, a friend of Mr. McDaniel, first discovered the Monte Carlo as he and some relatives were driving by the boat dock. Mr. Scruggs, his mother Tammy Scruggs Reed, and his uncle Jerry Scruggs pulled into the boat dock area and then called the Sumner and Trousdale County Sheriff's Departments. Mr. McDaniel was notified that his car had been found, and he, his mother, and his girlfriend also drove to the boat dock area to identify his car. Detective Tarlecky and the second Sumner County officer arrived in unmarked Ford

Crown Victorias. Additionally, Trousdale County Sheriff Ray Russell and Detective David Winnett arrived on the scene shortly thereafter, driving another unmarked Crown Victoria. Detective Tarlecky testified that the stolen Monte Carlo's doors were locked, but that he could see that the CD player had been removed from the dashboard. He also observed that the Monte Carlo's wheels, which were custom after-market wheels that he valued at around $2,000, were still on the car and that the car contained several other potentially valuable items. Mr. McDaniel examined his car and confirmed that the CD player had been ripped out of the dashboard and that his rear stereo amplifier was also missing.

Detective Tarlecky stated that as they were inspecting the stolen car, he and the other officers observed a white Crown Victoria drive slowly by the boat dock and begin to make a right turn into the parking area. Detective Tarlecky could see the driver and passenger, who were African-American males, and he testified that "their eyes opened as big as saucers when they saw us and the vehicle just jerked back off on to . . . the roadway." He stated that the turn back on the road "was a startled movement. They had looked down and saw us and they abruptly turned back . . . It caught our attention the way they did it." The white Crown Victoria continued across the Bledsoe Creek bridge, then turned into a church parking lot, turned around, and slowly drove back by the boat dock area again. Detective Tarlecky got in his vehicle, activated its emergency lights, and initiated a stop of the Crown Victoria. Detective Tarlecky identified the driver as James Phillips, and the passenger as Defendant. Mr. Phillips consented to a search of the vehicle. Detective Tarlecky found a Chevrolet key chain in the door panel on the driver's side. He tossed the keys to Sheriff Russell, who confirmed that the car keys fit the Monte Carlo. The officers then took Mr. Phillips and Defendant into custody.

The search of the car also revealed several completed job application forms, one of which had been filled out by Marcus Bradford and listed an address of 1100 Winwood Drive in the nearby town of Castalian Springs. Detective Tarlecky went to the address and spoke with Mr. Bradford, who confirmed that he lived there, and consented to a search of the common areas of the house and his bedroom. In the living room, Detective Tarlecky found a large speaker box and a CD player with part of a car dashboard attached to it. Detective Tarlecky discovered a large amplifier of the same brand as Mr. McDaniel's stolen amplifier and a blue backpack in the "game room" of the house. The backpack contained a red hat with a depiction of a $100 bill embroidered on it, and what Detective Tarlecky described as a red "doo rag." Detective Tarlecky also recovered from the house a wallet with Defendant's identification in it, a red T-shirt found in the dryer, a blue travel bag containing a roll of duct tape, and a number of CDs and a black bandana found in Mr. Bradford's room.

Mr. Bradford told Detective Tarlecky that Michael Miller and Michelle Guardiola were the lessees of the house. The officers contacted Mr. Miller and Ms. Guardiola, who

-4-

returned home in a black Chevrolet Impala. Mr. Miller and Ms. Guardiola consented to a search of the entire house and the Impala. In the black Impala, Detective Winnett found a red T-shirt and what appeared to be car stereo wiring. Sheriff Russell participated in a second search of the house; he testified that he discovered a lockbox and that a set of keys fitting the lockbox were found among the personal items taken from Defendant after his arrest. The lockbox contained a 40mm semi-automatic pistol and ammunition.

Defendant was charged with one count each of aggravated robbery, carjacking, attempt to commit especially aggravated kidnapping, and attempt to commit first degree murder.[2] At the trial, the State presented the videotape recording from the ATM's security camera, and Mr. McDaniel identified the man in the red shirt and red hat as the gunman. Mr. McDaniel testified that the carwash bays were well-lighted and that he was able to get a good look at Defendant and clearly see his face. Mr. McDaniel positively identified Defendant as being the man who sat behind him in the Monte Carlo, pushed him into the carwash bay wall, hit him, tried to duct tape his hands, and pursued him after he ran.

The State also presented the testimony of Lacey Smotherman, who said that she was at the carwash on the night of June 12, 2007, around 10:00 p.m. Ms. Smotherman knew Mr. McDaniel because he was dating a friend of hers. Ms. Smotherman testified that she saw a gold Nissan Maxima backed into one of the carwash bays. As she was emptying trash from her car, she saw Mr. McDaniel's Monte Carlo pulling around the carwash, driving slowly. She saw three people in the car and observed that the passenger, an African-American male, had a bandana covering his face. The passenger looked at her and then the Monte Carlo drove off. Ms. Smotherman testified that she was surprised that Mr. McDaniel had not spoken to her.

The State also presented the testimony of Deangelo Vaughn, who stated that he works at a nearby auto parts store on Highway 25. Mr. Vaughn testified that in June of 2007, two men drove into the store's parking lot in a white Crown Victoria. The men entered the store and offered to sell Mr. Vaughn a set of four 22-inch wheels for $500. The men said that the wheels were on a car that was parked "over at the lake." Mr. Vaughn testified that the $500 price for a set of 22-inch wheels is "not reasonable, it's awfully cheap." Mr. Vaughn told the men he couldn't leave the store, and they left. Later, Mr. Vaughn saw photographs of four men in the local newspaper and recognized two of them as the men who had tried to sell him the wheels. He contacted the Trousdale County Sheriff's Department and provided a written statement.

---

[2] Three others also were charged with crimes related to the incident: James Phillips, Marcus Bradford, and Michael Miller.

At trial, the parties stipulated that the police found Defendant's fingerprints on a gold Nissan Maxima later recovered by the investigating officers.

The jury convicted Defendant of all four crimes charged. The trial court sentenced Defendant as a Range I, standard offender, to twelve years for each class B felony conviction (aggravated robbery, carjacking, and attempt to commit especially aggravated kidnapping), and to twenty-five years for attempt to commit first degree murder. The trial court imposed a combination of concurrent and consecutive sentencing for an effective sentence of forty-nine years. The Court of Criminal Appeals affirmed the convictions and length of sentences and remanded "for the purpose of determining whether consecutive sentencing is appropriate under the Sentencing Act and State v. Allen, 259 S.W.3d 671 (Tenn. 2008)." State v. Davis, No. M2008-01216-CCA-R3-CD, 2010 WL 1837936, at *1 (Tenn. Crim. App. Apr. 19, 2010).

We granted Defendant's application for permission to appeal and address the following issues: (1) whether the trial court correctly determined that the law enforcement officers had reasonable suspicion to conduct an investigatory stop of the car driven by Mr. Phillips at the boat dock, and therefore properly denied Defendant's motion to suppress; and (2) whether the evidence is sufficient to support Defendant's conviction for attempt to commit first degree murder.

**Analysis**

**Motion to Suppress**

Defendant argues that the officers did not have sufficient reasonable suspicion to initiate an investigatory stop of Mr. Phillips's vehicle, and that all evidence discovered as a result of the searches of the car and the Winwood Drive residence should be suppressed. The State argues that, considering the totality of the circumstances, the officers had reasonable suspicion to stop the vehicle and therefore the initial seizure and subsequent searches pass constitutional muster. We agree with the State's argument, as did the Court of Criminal Appeals.

As we review the trial court's decision, we are mindful that the "trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). When the trial court has seen and heard the witnesses testify, we must afford considerable deference to the factual determinations made by the trial court. Madden v. Holland Grp. of Tenn., Inc., 277 S.W.3d 896, 898 (Tenn. 2009). Although "[t]he party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all

reasonable and legitimate inferences that may be drawn from that evidence," Odom, 928 S.W.2d at 23, the burden remains on the State to prove that a warrantless search or seizure was constitutionally permissible. State v. Nicholson, 188 S.W.3d 649, 656-57 (Tenn. 2006); State v. Henning, 975 S.W.2d 290, 298 (Tenn. 1998). "The issue of whether reasonable suspicion existed to validate a traffic stop is a mixed question of fact and law." State v. Garcia, 123 S.W.3d 335, 342 (Tenn. 2003). We review the trial court's application of law to the facts de novo without a presumption of correctness. State v. Day, 263 S.W.3d 891, 900 (Tenn. 2008); State v. Daniel, 12 S.W.3d 420, 423 (Tenn. 2000).

Both the United States Constitution and the Tennessee Constitution guarantee that persons will not be subjected to "unreasonable searches and seizures." U.S. Const. amend. IV; Tenn. Const. art. 1, § 7. The Fourth Amendment to the Constitution of the United States, applicable to the states as recognized in Mapp v. Ohio, 367 U.S. 643, 655 (1961), provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no [w]arrants shall issue, but upon probable cause, supported by [o]ath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Similarly, Article I, § 7 of the Tennessee Constitution provides:

> [T]he people shall be secure in their persons, houses, papers, and possessions, from unreasonable searches and seizures; and that general warrants, whereby an officer may be commanded to search suspected places, without evidence of the fact committed, or to seize any person or persons not named, whose offences are not particularly described and supported by evidence, are dangerous to liberty and ought not to be granted.

The protections of the Fourth Amendment and Article I, § 7 apply "to all seizures of the person, including seizures that involve only a brief detention short of traditional arrest." State v. Berrios, 235 S.W.3d 99, 104 (Tenn. 2007) (quoting United States v. Brignoni-Ponce, 422 U.S. 875, 878 (1975)). An officer's stop of a vehicle by activating his or her emergency lights constitutes a seizure. Day, 263 S.W.3d at 902; Garcia, 123 S.W.3d at 343; State v. Binette, 33 S.W.3d 215, 218 (Tenn. 2000). At the point that Detective Tarlecky activated his vehicle's emergency lights and stopped the Crown Victoria, he seized Mr. Phillips's vehicle and its passengers without a warrant. We begin with the premise that "[u]nder both the federal and state constitutions, a warrantless seizure is presumed unreasonable, and evidence discovered as a result thereof is subject to suppression unless the State demonstrates that the seizure was conducted pursuant to one of the narrowly defined

exceptions to the warrant requirement." Nicholson, 188 S.W.3d at 656; accord State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997).

This Court has recognized "three distinct levels of interaction between citizens and law enforcement officials." State v. Ingram, 331 S.W.3d 746, 755-56 (Tenn. 2011). As we observed in Ingram,

> The first and most limited interaction is the brief police-citizen encounter, which requires no objective justification and is limited to informal questioning of the person involved. Day, 263 S.W.3d at 901. The next level is the brief investigatory detention, which must be supported by reasonable suspicion of wrong-doing and entitles the officer to conduct a stop and frisk under the principles of Terry v. Ohio, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). Day, 263 S.W.3d at 901. The third and most invasive level is the full-scale arrest, which must be supported by probable cause. Id.; accord [State v. ]Crutcher, 989 S.W.2d [295, 300 (Tenn. 1999)].

331 S.W.3d at 756; see also State v. Williams, 185 S.W.3d 311, 315 (Tenn. 2006). This case involves a brief investigatory detention, which occurred when the officers pulled over the white Crown Victoria driven by Mr. Philips. An exception to the warrant requirement exists when a law enforcement officer "'makes an investigatory stop based upon reasonable suspicion, supported by specific and articulable facts, that a criminal offense has been or is about to be committed.'" Williams, 185 S.W.3d at 318 (quoting Binette, 33 S.W.3d at 218); see Terry v. Ohio, 392 U.S. 1, 20-21 (1968). We have defined "reasonable suspicion" as "'a particularized and objective basis for suspecting the subject of a stop of criminal activity.'" Day, 263 S.W.3d at 903 (quoting Binette, 33 S.W.3d at 218). The standard for determining reasonable suspicion is a lower standard than that for determining the existence of probable cause:

> Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause.

Yeargan, 958 S.W.2d at 632 (quoting Alabama v. White, 496 U.S. 325, 330 (1990)); see also United States v. Sokolow, 490 U.S. 1, 7-8 (1989).

The trial court's determination of whether a police officer's reasonable suspicion is supported by specific and articulable facts is an objective, fact-intensive inquiry. Williams,

185 S.W.3d at 318. It requires the court to consider the totality of the circumstances established by the proof. Day, 263 S.W.3d at 903. These circumstances include, but are "not limited to, objective observations, information obtained from other police officers or agencies, information obtained from citizens, and the pattern of operation of certain offenders." State v. Watkins, 827 S.W.2d 293, 294 (Tenn. 1992).

In the present case, the trial court found that the officers articulated a reasonable suspicion for making an investigatory stop of Mr. Phillips's car, and the evidence does not preponderate otherwise. On the morning of June 13, 2007, Detective Tarlecky received a BOLO dispatch concerning a carjacking that occurred in Hartsville the previous night. The dispatch contained information describing the stolen car and a general description of the suspects based on Mr. McDaniel's statement. The stolen vehicle was found approximately two hours later. Detective Tarlecky arrived at the crime scene and observed that the stolen Monte Carlo was only partially stripped of valuable parts – a set of custom wheels that he valued at approximately $2,000 remained on the car. Detective Tarlecky testified that based on his past law enforcement experience, he knew that car thieves often return later to the car to finish removing the valuable parts. This Court has observed that in determining whether police had reasonable suspicion supported by specific articulable facts, "[a] court must also consider the rational inferences and deductions that a trained police officer may draw from the facts and circumstances known to him [or her]." Id.

Shortly after the Monte Carlo was found, the officers and others gathered at the boat dock saw a white Crown Victoria with two male African-American occupants meeting the general description of the suspects provided in the BOLO dispatch begin to enter the parking lot where the stolen car had been left. When the Crown Victoria's occupants saw the people around the stolen car at the boat dock, the driver abruptly turned the car back onto the roadway in a change of direction. The officers then observed the Crown Victoria turn around in a nearby church parking lot and slowly drive back by the boat dock going the other direction. Detective Tarlecky testified that in his experience, making a turn when noticing a police presence often means "that they don't want the police to take notice to them." Moreover, Detective Tarlecky testified that he was able to see the expressions on the occupants' faces when they began to pull in to the boat dock area, stating that they appeared startled and "their eyes opened as big as saucers when they saw us and the vehicle just jerked back off on to . . . the roadway."

Defendant argues that Detective Tarlecky's decision to make an investigatory stop of the vehicle was based on nothing more than a "hunch" or a "gut feeling" and the fact that the car's occupants were African-American men. Defendant correctly points out that "an officer making an investigatory stop must be able to articulate something more than an 'inchoate and unparticularized suspicion or "hunch."'" Day, 263 S.W.3d at 902 (quoting Terry, 392 U.S.

at 27). We also generally agree that making a stop of a vehicle based on nothing more than the race and gender of the occupants would not satisfy the reasonable suspicion standard; however, the officers in this case stopped the vehicle for reasons other than merely the race and gender of its occupants. Considering the *totality* of the circumstances, the evidence does not preponderate against the trial court's decision not to suppress the evidence because the officers articulated specific facts, as described above, supporting their reasonable suspicion of the occupants of the Crown Victoria.

We have previously recognized that "a location's characteristics are relevant in determining whether the circumstances are sufficiently suspicious to warrant further investigation, . . . and that nervous, evasive behavior is also a pertinent factor in determining reasonable suspicion." Nicholson, 188 S.W.3d at 661 (citing Illinois v. Wardlow, 528 U.S. 119, 124 (2000)). In the present case, the officers had reasonable suspicion to make a brief investigatory stop based on these factors: the location (a boat dock area connected to criminal activity in that it contained a car stolen the night before), the fact that the stolen car had not been completely stripped of valuable parts, the abrupt and evasive behavior of the Crown Victoria's driver, the startled and suspicious demeanor and appearance of the occupants that was directly observed by Detective Tarlecky, and the fact that the occupants matched the general description of the suspects as described by the BOLO dispatch. Because the stop of the vehicle was legal and the subsequent searches of the Crown Victoria, the Impala driven by Mr. Miller, and the residence were conducted with valid consent, the trial court did not err in refusing to suppress the evidence discovered by the police.

### Sufficiency of the Evidence – Attempt to Commit First Degree Murder

Defendant argues that the evidence was insufficient to support his conviction for attempt to commit first degree murder. The standard of appellate review in assessing a challenge to the sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). "In making this determination, we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom." State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010). In determining the sufficiency of the evidence, we do not reweigh the evidence, State v. Smith, 24 S.W.3d 274, 279 (Tenn. 2000), since questions regarding witness credibility, the weight to be given the evidence, and factual issues raised by the evidence are resolved by the jury, as the trier of fact. Majors, 318 S.W.3d at 857. "'Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty

verdict.'" State v. Sisk, 343 S.W.3d 60, 65 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)).

To determine the elements of the offense of attempt to commit first degree murder, we review the statutory definitions of first degree murder and criminal attempt. At the time of the offense, Tennessee Code Annotated section 39-13-202(a) (2006) defined first degree murder in pertinent part as "[a] premeditated and intentional killing of another." "Premeditation" is defined as meaning "that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time." Tenn. Code Ann. § 39-13-202(d). "'Intentional' refers to a person who acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-302(a).

Criminal attempt is defined at Tennessee Code Annotated section 39-12-101, which provides in pertinent part that:

> (a) A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense:
> . . . .
> (3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.
> (b) Conduct does not constitute a substantial step under subdivision (a)(3), unless the person's entire course of action is corroborative of the intent to commit the offense.

As is apparent from the language of the criminal attempt statute, a defendant who acts with the required culpable mental state "may be convicted of criminal attempt based on conduct constituting a substantial step toward the commission of the offense." State v. Richardson, 251 S.W.3d 438, 443 (Tenn. 2008). Defendant argues that the evidence was insufficient to support the conclusions that (1) he intended to kill Mr. McDaniel with the requisite premeditation, and (2) his conduct constituted a substantial step toward the commission of murdering Mr. McDaniel. The State argues that the jury was entitled to conclude that Defendant and his fellow perpetrator planned and intended to kill Mr. McDaniel, and that Defendant's conduct, considered in light of the totality of the circumstances, constituted a substantial step sufficient to support a conviction for attempted murder. We agree with the State's position.

The existence of the element of premeditation is a question of fact to be resolved by the jury. State v. Suttles, 30 S.W.3d 252, 261 (Tenn. 2000). Premeditation "may be established by proof of the circumstances surrounding the killing" or attempted killing. Id.; State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997). In Suttles and Bland, we identified several factors that tend to support a finding of premeditation, including "the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime, and calmness immediately after the killing." Suttles, 30 S.W.3d at 261; Bland, 958 S.W.2d at 660. Similarly, a defendant's intent to kill may be inferred by the jury from the evidence establishing the surrounding facts and circumstances. State v. Lowery, 667 S.W.2d 52, 57 (Tenn. 1984); State v. Inlow, 52 S.W.3d 101, 105 (Tenn. Crim. App. 2000).

Considering the totality of the facts and circumstances surrounding the crimes committed against Mr. McDaniel in the course of the robbery, carjacking, and assault, the evidence is sufficient to demonstrate that a rational trier of fact could conclude that Defendant and his co-perpetrator, with premeditation, planned and intended to kill Mr. McDaniel. They procured a pistol and kept it pointed at Mr. McDaniel, who was unarmed, throughout the robbery. They forced Mr. McDaniel to withdraw all the money he could from his checking account at the ATM, demanding and procuring a receipt to prove he had done so. They made him drive back to the carwash bay, where they forced him against one of the walls. Although Mr. McDaniel pleaded with them to take his car and leave him at the carwash, Defendant said, "no, you're going with us." At this point, the assailants had been presented with the opportunity to take everything of value from their victim that they possibly could have, and still insisted on taking him with them. When Mr. McDaniel saw Defendant approaching with a roll of black duct tape, which the defendants had clearly procured in advance and planned to use in binding him, he began to struggle. Defendant hit Mr. McDaniel in the face and ordered his companion, who was nearby and also in the carwash bay, to "get the gun, we're going to shoot this motherfucker *right here*." His use of the words "right here" support an inference that the defendants' plan had been to shoot Mr. McDaniel somewhere else after they had bound him. After Mr. McDaniel was fortunately able to break free and run, Defendant pursued him in a footrace.

From these circumstances, the jury was entitled, but not required, to reach the conclusion that the defendants acted with premeditated intent to kill Mr. McDaniel, and that the only reason Mr. McDaniel was still alive was that he was able to escape and run. Defendant expressed his intention to shoot his victim. A defendant's verbal expression of intent to commit a crime obviously supports the conclusion that he or she acted with the requisite intentional behavior. See State v. Fowler, 3 S.W.3d 910, 911 (Tenn. 1999) (defendant's expressed intention to pay $200 as a "finder's fee" for an underage boy from

whom he wanted "straight sex" supported conviction for attempted statutory rape); State v. Taylor, 63 S.W.3d 400, 408 (Tenn. Crim. App. 2001) (defendant twice stating his intent to forcibly "engage in unlawful sexual penetration" of minor victim supported conviction for attempted rape); Inlow, 52 S.W.3d at 105 (defendant's making prior statements "that could easily have been interpreted as threats" supported conviction for attempted second degree murder); State v. Elder, 982 S.W.2d 871, 875 (Tenn. Crim. App. 1998) (defendant's statement prior to shooting victim "You think I'm playin'; I'll kill you" supported conviction for attempted murder); State v. Bradfield, 973 S.W.2d 937, 948 (Tenn. Crim. App. 1997) (during course of struggle with victim, defendant's statement that he was going to "shoot [his] ass" and reaching for concealed pistol sufficient to support attempted first degree murder conviction).

The same circumstances described above also support a conclusion that Defendant's conduct constituted "a substantial step toward the commission of the offense" of murder. Tenn. Code Ann. § 39-12-101(a)(3). The Tennessee General Assembly codified the law of criminal attempt in 1989 to include the "substantial step" requirement. See Act of May 24, 1989, ch. 591, § 1, 1989 Tenn. Pub. Acts 1169, 1184-85.[3] In enacting the 1989 criminal attempt statute, the legislature based the attempt statute on the Model Penal Code.[4]

---

[3] Before 1989, "the law of criminal attempt, though sanctioned by various statutes, was judicially defined." State v. Reeves, 916 S.W.2d 909, 910-11 (Tenn. 1996). The pre-1989 common law of attempt required "(1) an intent to commit a specific crime; (2) an overt act toward the commission of that crime; and (3) a failure to consummate the crime." Id. at 911. In Reeves, we determined that in passing the criminal attempt statute, the legislature intended not to retain the common law distinction illustrated in Dupuy v. State, 325 S.W.2d 238 (Tenn. 1959) between "mere preparation," which was insufficient to prove a criminal attempt, and an "overt act" toward the commission of a crime, which the State was required to prove under the common law formulation of criminal attempt. 916 S.W.2d at 911. The Reeves Court recognized that "the Dupuy approach to attempt law has been consistently and effectively criticized" as overly rigid, restrictive, and unworkable. Id. at 913.

[4] The Model Penal Code, Section 5.01, provides in pertinent part:

(1) **Definition of attempt**. A person is guilty of an attempt to commit a crime if, acting with the kind of culpability otherwise required for commission of the crime, he:

(a) purposely engages in conduct that would constitute the crime if the attendant circumstances were as he believes them to be; or
(b) when causing a particular result is an element of the crime, does or omits to do anything with the purpose of causing or with the belief that it will cause such result without further conduct on his part; or
(c) purposely does or omits to do anything that, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in

(continued...)

-13-

Reeves, 916 S.W.2d at 913. The inclusion of the "substantial step" requirement brought Tennessee in line with a majority of states. 2 Wayne R. LaFave, Substantive Criminal Law 2d ed. § 11.4(e), at 226 (2003).

This Court first addressed the "substantial step" requirement in State v. Reeves. In Reeves, two twelve-year-old schoolgirls plotted to kill their teacher by putting rat poison in her coffee. 916 S.W.2d at 910. The teacher entered the classroom and saw the girls leaning over her desk; after they ran back to their seats, a purse belonging to one of the girls that had been left beside the teacher's coffee cup was found to contain a packet of rat poison. Id. This Court observed that applying the pre-1989 common law analysis that sharply distinguished "mere preparation" from an "overt act" would likely have required reversal of the convictions for attempted murder, id. at 914, and stated that the earlier approach severely undercuts "the primary objective of the law – that of preventing inchoate crimes from becoming full-blown ones." Id. at 913. We affirmed the convictions for attempted murder, finding that under the circumstances the defendants took a substantial step toward the commission of poisoning their teacher, concluding,

> We hold that when an actor possesses materials to be used in the commission of a crime, at or near the scene of the crime, and where the possession of those materials can serve no lawful purpose of the actor under the circumstances, the jury is entitled, but not required, to find that the actor has taken a "substantial step" toward the commission of the crime if such action is strongly corroborative of the actor's overall criminal purpose.

Reeves, 916 S.W.2d at 914. This holding is applicable to the case at bar. Although Defendant did not have actual possession of the handgun during his struggle with Mr. McDaniel and at the time he told his companion to "get the gun" because they were going to shoot the victim "right here," both the co-defendant gunman and his weapon were "at or near the scene of the crime" – inside the carwash bay – and Mr. McDaniel testified that Defendant appeared to be the one in control and in charge during the encounter. In Reeves, we affirmed the attempted murder conviction of Ms. Reeves even though the rat poison was not in her actual possession, but in her co-defendant's purse which was lying near the teacher's coffee cup. 916 S.W.2d at 910.[5]

---

[4](...continued)
his commission of the crime.

[5] The co-defendant, Ms. Coffman, did not appeal her conviction in that case.

-14-

This case also bears some similarities to the facts presented in Bradfield, where the defendant carried a concealed pistol in his shoe at a sentencing hearing and became involved in a struggle with the courtroom bailiff. 973 S.W.2d at 941-42. The Bradfield defendant "reached for his gun and as the two struggled for the weapon, the defendant informed the deputy that he might as well give up because the defendant was going to 'shoot [his] ass.'" Id. at 947-48. The officers succeeded in wrestling the gun from the defendant without harm. Id. at 942. The Court of Criminal Appeals concluded that

> The jury could infer the defendant took a substantial step toward his stated goal, namely shooting the victim. Though not a necessary inference, the jury certainly could have inferred the defendant meant to shoot and kill the victim. The evidence is, in other words, sufficient to support the conviction for attempted first-degree murder.

Id. at 948.

Ultimately, the question of whether a defendant has taken a substantial step toward the commission of a crime sufficient to support a conviction for criminal attempt is necessarily a heavily fact-intensive inquiry determined by the specific circumstances shown in each individual case; indeed, the comments of the Tennessee Sentencing Commission to section 39-12-101 provide that "[b]ecause of the infinite variety of factual situations that can arise, subdivision (a)(3) leaves the issue of what constitutes a substantial step for determination in each particular case." See also Jeffrey F. Ghent, Annotation, What Constitutes Attempted Murder, 54 A.L.R. 3d 612 §2[a] (1973) ("The authorities agree that it is impossible to formulate a general rule or definition of what constitutes an attempt (to murder), which may be applied as a test in all cases, and that each case must be determined on its own facts with the assistance of general guiding principles."). Under the facts presented here, considering the totality of the circumstances and affording the State the strongest legitimate view of the evidence and the reasonable inferences therefrom, we concur with the judgment of the trial court and the Court of Criminal Appeals that the evidence was sufficient for the jury to find that Defendant took a substantial step toward killing Mr. McDaniel, and thus to convict Defendant of attempt to commit first degree murder. The evidence supports an inference that Mr. McDaniel was very close, in both a spacial and temporal sense, to becoming a shooting victim and possibly a murder victim. The jury was entitled, but not required, to draw this inference.

## Conclusion

We affirm the Defendant's convictions. Because neither the State nor Defendant has appealed the ruling of the Court of Criminal Appeals that the case should be remanded for

-15-

the purpose of determining whether consecutive sentencing is appropriate under the Sentencing Act and State v. Allen, 259 S.W.3d 671 (Tenn. 2008), the case is remanded to the Criminal Court for Trousdale County for that purpose.  It appears from the record that the Defendant is indigent; therefore, costs on appeal are assessed to the State of Tennessee.

_____
SHARON G. LEE, JUSTICE