# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs April 23, 2013

## STATE OF TENNESSEE v. CHRISTOPHER LEE DAVIS

**Direct Appeal from the Criminal Court for Trousdale County**
**No. 07-55     John D. Wootten, Jr., Judge**

---

**No. M2012-01546-CCA-R3-CD - Filed July 18, 2013**

---

The appellant, Christopher Lee Davis, was convicted of attempted first degree murder, a Class A felony; aggravated robbery, a Class B felony; carjacking, a Class B felony; and attempted especially aggravated kidnapping, a Class B felony. On direct appeal, our supreme court affirmed the appellant's convictions but remanded for resentencing on the issue of consecutive sentencing. See State v. Davis, 354 S.W.3d 718, 721-22 (Tenn. 2011). On remand, the trial court again ordered partial consecutive sentencing, which resulted in an overall effective sentence of forty-nine years. On appeal, the appellant challenges the imposition of consecutive sentencing. Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and THOMAS T. WOODALL, J., joined.

William K. Cather, Lebanon, Tennessee, for the appellant, Christopher Lee Davis.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Senior Counsel; Tom P. Thompson, District Attorney General; and Jason Lawson, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I.  Factual Background

On direct appeal, our supreme court summarized the facts adduced at trial as follows:

On June 12, 2007, the victim, Glen McDaniel, drove his black 2001 Chevrolet Monte Carlo into a carwash bay in Hartsville, Tennessee. While Mr. McDaniel was washing his car, he saw a gold Nissan Maxima pull into the carwash and noticed that the two men in the back of the Maxima were staring at him. Mr. McDaniel continued washing his car until he was confronted by two African-American men wearing bandanas over their faces who entered his carwash bay from opposite sides. The men wore red shirts and red hats, and one of them had a hat with a depiction of a $100 bill embroidered on it. Mr. McDaniel described one of them as approximately six feet, three or four inches tall and heavy set with dark skin. The other man, whom Mr. McDaniel identified at trial as being the [appellant]. . . , was nearly the same height but thinner and with a lighter complexion.

The larger man walked up to Mr. McDaniel, pointed a pistol at his chest, and told him to get into the Monte Carlo. Mr. McDaniel complied because he was afraid the man would shoot him if he refused. The man with the pistol got in the passenger seat and kept his gun pointed at Mr. McDaniel the entire time they were in the Monte Carlo. [The appellant] got in the back seat behind Mr. McDaniel and kept a grip on Mr. McDaniel's shoulders. The men asked for $800, and Mr. McDaniel replied that he did not have that much money on him and that he did not carry a wallet, but did have an ATM debit card. The men ordered him to drive across the street to an ATM.

The gunman walked Mr. McDaniel up to the ATM, and [the appellant] held his hand over one of the ATM video cameras. [The appellant] told Mr. McDaniel to get a receipt so they could make sure that he had withdrawn all of the money in his checking account. Mr. McDaniel completed the ATM withdrawal and gave the gunman the money and the receipt.

All three got back into the Monte Carlo, and Mr. McDaniel drove back to the carwash. As they approached, they saw Lacy Smotherman, an acquaintance of Mr. McDaniel, sitting in a parked car at the carwash, so the men told Mr. McDaniel to drive down the street. He did, and when they

turned the car around and returned to the carwash, Ms. Smotherman was gone. Mr. McDaniel pulled his car into one of the carwash bays, and the men ordered him to get out of the car.

[The appellant] pushed Mr. McDaniel against one of the walls in the carwash bay. Mr. McDaniel asked [the appellant] to take his car and leave him at the carwash, but [the appellant] refused, saying, "no, you're going to go with us." Mr. McDaniel testified that at this point, "I thought I was dead to be honest with you." He was standing with his chest pressed against the wall and [the appellant] was trying to pull his hands behind his back. Mr. McDaniel looked over his shoulder and saw that [the appellant] had a roll of black duct tape. Mr. McDaniel testified that "I yanked my hands right back up . . . 'cause I knew, you know, if I was duct taped I was done for." He struggled with [the appellant], who shoved his face into the brick wall, injuring his nose and face, and hit him in the eye. [The appellant] said, "get the gun, we're going to shoot this motherfucker right here." Mr. McDaniel testified that during the incident [the appellant] appeared to be the one in control of the situation, giving orders and instructions to the other man.

Mr. McDaniel said that at this point, "I figured if I was going to get shot, I might as well try to run." He broke free from [the appellant's] grasp and ran toward a nearby restaurant. [The appellant] chased after him. The restaurant was closed. Mr. McDaniel ran around the side and headed for a gas station. He came to a steep embankment and jumped down the slope into the ditch. As he came over the other side and continued running toward the gas station, Mr. McDaniel saw his Monte Carlo pull out of the carwash. He also saw a black Chevrolet Impala pulling out at the same time. Mr. McDaniel reached the counter inside the gas station, told the attendant to call the police because he had just been carjacked and "those guys are trying to kill me," and collapsed from exhaustion. The attendant revived him, and the Sheriff's Department arrived a few minutes later. That night, Mr. McDaniel provided a written statement to law enforcement officers describing the incident.

The next day, Detective Chris Tarlecky of the Sumner

County Sheriff's Department received information from Trousdale County law enforcement to "be on the lookout" ("BOLO") for the suspects in the carjacking and robbery. The BOLO dispatch contained the basic facts of the incident, described the stolen vehicle as a 2001 black Monte Carlo with custom wheels, provided a general description of the suspects, and identified the suspects' vehicle as a gold Maxima. Later that day the abandoned Monte Carlo was discovered at the Bledsoe Creek boat dock. Detective Tarlecky and another Sumner County Sheriff's Department officer drove to the boat dock.

Justin Scruggs, a friend of Mr. McDaniel, first discovered the Monte Carlo as he and some relatives were driving by the boat dock. Mr. Scruggs, his mother Tammy Scruggs Reed, and his uncle Jerry Scruggs pulled into the boat dock area and then called the Sumner and Trousdale County Sheriff's Departments. Mr. McDaniel was notified that his car had been found, and he, his mother, and his girlfriend also drove to the boat dock area to identify his car. Detective Tarlecky and the second Sumner County officer arrived in unmarked Ford Crown Victorias. Additionally, Trousdale County Sheriff Ray Russell and Detective David Winnett arrived on the scene shortly thereafter, driving another unmarked Crown Victoria. Detective Tarlecky testified that the stolen Monte Carlo's doors were locked, but that he could see that the CD player had been removed from the dashboard. He also observed that the Monte Carlo's wheels, which were custom after-market wheels that he valued at around $2,000, were still on the car and that the car contained several other potentially valuable items. Mr. McDaniel examined his car and confirmed that the CD player had been ripped out of the dashboard and that his rear stereo amplifier was also missing.

Detective Tarlecky stated that as they were inspecting the stolen car, he and the other officers observed a white Crown Victoria drive slowly by the boat dock and begin to make a right turn into the parking area. Detective Tarlecky could see the driver and passenger, who were African-American males, and he testified that "their eyes opened as big as saucers when they saw us and the vehicle just jerked back off on to . . . the

-4-

roadway." He stated that the turn back on the road "was a startled movement. They had looked down and saw us and they abruptly turned back . . . It caught our attention the way they did it." The white Crown Victoria continued across the Bledsoe Creek bridge, then turned into a church parking lot, turned around, and slowly drove back by the boat dock area again. Detective Tarlecky got in his vehicle, activated its emergency lights, and initiated a stop of the Crown Victoria. Detective Tarlecky identified the driver as James Phillips, and the passenger as [the appellant]. Mr. Phillips consented to a search of the vehicle. Detective Tarlecky found a Chevrolet key chain in the door panel on the driver's side. He tossed the keys to Sheriff Russell, who confirmed that the car keys fit the Monte Carlo. The officers then took Mr. Phillips and [the appellant] into custody.

The search of the car also revealed several completed job application forms, one of which had been filled out by Marcus Bradford and listed an address of 1100 Winwood Drive in the nearby town of Castalian Springs. Detective Tarlecky went to the address and spoke with Mr. Bradford, who confirmed that he lived there, and consented to a search of the common areas of the house and his bedroom. In the living room, Detective Tarlecky found a large speaker box and a CD player with part of a car dashboard attached to it. Detective Tarlecky discovered a large amplifier of the same brand as Mr. McDaniel's stolen amplifier and a blue backpack in the "game room" of the house. The backpack contained a red hat with a depiction of a $100 bill embroidered on it, and what Detective Tarlecky described as a red "doo rag." Detective Tarlecky also recovered from the house a wallet with [the appellant's] identification in it, a red T-shirt found in the dryer, a blue travel bag containing a roll of duct tape, and a number of CDs and a black bandana found in Mr. Bradford's room.

Mr. Bradford told Detective Tarlecky that Michael Miller and Michelle Guardiola were the lessees of the house. The officers contacted Mr. Miller and Ms. Guardiola, who returned home in a black Chevrolet Impala. Mr. Miller and Ms. Guardiola consented to a search of the entire house and the

Impala. In the black Impala, Detective Winnett found a red T-shirt and what appeared to be car stereo wiring. Sheriff Russell participated in a second search of the house; he testified that he discovered a lockbox and that a set of keys fitting the lockbox were found among the personal items taken from [the appellant] after his arrest. The lockbox contained a 40mm semi-automatic pistol and ammunition.

[The appellant] was charged with one count each of aggravated robbery, carjacking, attempt to commit especially aggravated kidnapping, and attempt to commit first degree murder. At the trial, the State presented the videotape recording from the ATM's security camera, and Mr. McDaniel identified the man in the red shirt and red hat as the gunman. Mr. McDaniel testified that the carwash bays were well-lighted and that he was able to get a good look at [the appellant] and clearly see his face. Mr. McDaniel positively identified [the appellant] as being the man who sat behind him in the Monte Carlo, pushed him into the carwash bay wall, hit him, tried to duct tape his hands, and pursued him after he ran.

The State also presented the testimony of Lacey Smotherman, who said that she was at the carwash on the night of June 12, 2007, around 10:00 p.m. Ms. Smotherman knew Mr. McDaniel because he was dating a friend of hers. Ms. Smotherman testified that she saw a gold Nissan Maxima backed into one of the carwash bays. As she was emptying trash from her car, she saw Mr. McDaniel's Monte Carlo pulling around the carwash, driving slowly. She saw three people in the car and observed that the passenger, an African-American male, had a bandana covering his face. The passenger looked at her and then the Monte Carlo drove off. Ms. Smotherman testified that she was surprised that Mr. McDaniel had not spoken to her.

The State also presented the testimony of Deangelo Vaughn, who stated that he works at a nearby auto parts store on Highway 25. Mr. Vaughn testified that in June of 2007, two men drove into the store's parking lot in a white Crown Victoria. The men entered the store and offered to sell Mr. Vaughn a set of four 22-inch wheels for $500. The men said

that the wheels were on a car that was parked "over at the lake." Mr. Vaughn testified that the $500 price for a set of 22-inch wheels is "not reasonable, it's awfully cheap." Mr. Vaughn told the men he couldn't leave the store, and they left. Later, Mr. Vaughn saw photographs of four men in the local newspaper and recognized two of them as the men who had tried to sell him the wheels. He contacted the Trousdale County Sheriff's Department and provided a written statement.

At trial, the parties stipulated that the police found [the appellant's] fingerprints on a gold Nissan Maxima later recovered by the investigating officers.

State v. Davis, 354 S.W.3d 718, 722-725 (Tenn. 2011) (footnotes omitted). The appellant was eventually indicted on four counts: aggravated robbery, carjacking, attempted first degree murder, and attempted especially aggravated kidnapping. After a jury trial, the appellant was found guilty as charged on all four counts.

At a sentencing hearing, the trial court sentenced the appellant as a Range I, standard offender to twenty-five years for the attempted first degree murder and to twelve years for each of the three remaining felonies. On direct appeal, this court summarized the proof adduced at the sentencing hearing as follows:

At the sentencing hearing, Judy Kerr, with the Tennessee Board of Probation and Parole, testified that she prepared [the appellant's] presentence report, which was introduced as an exhibit without objection. At the time of the sentencing hearing, [the appellant] was twenty years old. He reported that he dropped out of high school in the tenth grade. [The appellant] told Ms. Kerr that he had completed his GED, but Ms. Kerr verified that [the appellant] had, in fact, failed his pretest for the GED exam and had never returned to the class. As employment, [the appellant] reported working for a fast food restaurant from January 2005 until his arrest in August 2005 on a murder charge. [The appellant] stated that he did not have a relationship with his family, and that he stayed with friends. [The appellant] reported that "he [had] sold drugs for a living since he was thirteen years old."

Ms. Kerr said that when [the appellant] was seventeen

years old, he was charged with criminal homicide and unlawful possession of a weapon. When he turned eighteen, [the appellant] was indicted on the charges as an adult but the charges were dismissed on February 28, 2007. Ms. Kerr said that [the appellant] ha[d] one prior conviction, in 2006, for an assault committed while he was in the Davidson County Jail awaiting trial on the murder charge. [The appellant] was sentenced to sixty days in confinement for this offense. [The appellant] reported joining the Bloods gang when he was eleven years old and was a member in both Davidson and Henry County. [The appellant] said that he obtained the rank of "00G status" which is the highest rank within the gang. As proof of his membership in the gang, [the appellant] stated that he has three burns in the shape of a triangle on his right upper arm. [The appellant], however, said that he was no longer a member of the gang at the time the presentence report was prepared.

According to the victim's impact statement, the victim still suffered emotional distress and depression as a result of the incident and reported feeling scared when in a crowd or outside his home at night. The victim wrote, "I am totally and completely angry that this happened to me. I was shocked that someone could actually do this to another human being without the slightest regard for another human life or the effect it would have on all our futures." The victim stated that he was forced to sell his vehicle because he was afraid for his life and that of his friends and family.

State v. Christopher Lee Davis, No. M2008-01216-CCA-R3-CD, 2010 WL 1837936, at *11 (Tenn. Crim. App. at Nashville, Apr. 19, 2010), perm. to appeal granted, (Tenn. Jan. 13, 2011). The trial court ordered the appellant to serve his sentence for attempted especially aggravated kidnapping concurrently with his sentence for carjacking, and otherwise ordered the appellant to serve his sentences consecutively, resulting in an overall effective sentence of forty-nine years. Id. at *1.

The appellant appealed his convictions and sentences, raising numerous claims, including challenging the trial court's imposition of consecutive sentencing. Id. On appeal, this court affirmed the appellant's convictions on all four counts, as well as the length of each of his individual sentences. However, this court remanded the appellant's case for resentencing solely on the issue of consecutive sentencing, explaining that

-8-

[o]n January 14, 2009, after the submission of [the appellant's] brief on appeal, the United States Supreme Court concluded that a defendant's constitutional right to trial by jury is not implicated by sentencing structures, such as Tennessee's, which require the trial court "to make certain predicate fact findings" before imposing consecutive sentencing. Oregon v. Ice, 555 U.S. 160, 129 S. Ct. 711, 715 n.3, 716-720, 172 L. Ed. 2d 517 (2009).

The statute requires certain findings to be made before a trial court can order consecutive sentences. See T.C.A. § 40-35-115(b). Because the trial court did not make any such findings, it erred in ordering the [appellant] to serve consecutive sentences. Accordingly, we remand this case for the sole purpose of determining the manner of service of [the appellant's] sentences in accordance with the Sentencing Act.

Id. at *16. The Tennessee Supreme Court granted the appellant's application for permission to appeal and affirmed this court's judgment. See Davis, 354 S.W.3d at 733.

On remand, the trial court conducted a new sentencing hearing. A victim impact statement was read into the record, in which the victim discussed the injuries that he had sustained during the encounter and the ongoing psychological and financial harm that he endured due to the appellant's crimes. The appellant's presentence report also was entered into the record, in which the appellant acknowledged that he was a member of the "Bloods" street gang and that he had achieved the highest rank within that organization. The appellant's criminal history included an arrest for first degree murder and a conviction for assault. The appellant also had an additional first degree murder charge that was pending. Regarding employment, the appellant said that he was a drug dealer. The presentence report indicated that the appellant had reported that he did not have a relationship with his family and that he "stayed with friends and sold drugs to get by." The presentence report stated that the appellant claimed to have sold drugs for a living since he was thirteen years old and that his only legitimate employment had been at a Kentucky Fried Chicken (KFC) for a period of six months in 2005.

After receiving this evidence and listening to arguments from the parties, the trial court found by a preponderance of the evidence that three statutory factors were present that would support consecutive sentences: (1) the appellant was a professional criminal who had devoted his life to criminal acts as a major source of livelihood, (2) the appellant was an offender whose criminal history was extensive, and (3) the appellant was a dangerous

offender whose behavior showed little or no respect for human life. Based on these findings, the trial court again ordered the appellant to serve the same partial consecutive sentences, resulting in an overall effective sentence of forty-nine years.

The appellant filed a timely notice of appeal, challenging the trial court's decision to order partial consecutive sentences.

## II. Analysis

In conducting its sentencing review, this court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the appellant in his own behalf; and (8) the potential for rehabilitation or treatment. See Tenn. Code Ann. §§ 40-35-102, -103, -210; see also State v. Bise, 380 S.W.3d 682, 697-98 (Tenn. 2012). The burden is on the appellant to demonstrate the impropriety of his sentence. See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.

We note that under the 1989 Sentencing Act, appellate review of the length, range, or manner of service of a sentence was de novo with a presumption of correctness. See Bise, 380 S.W.3d at 693; Tenn. Code Ann. § 40-35-401(d). However, in 2005, in response to Blakely v. Washington, 542 U.S. 296 (2004), our legislature passed amendments to the Sentencing Act to ensure that Tennessee's sentencing scheme could withstand Sixth Amendment scrutiny. See State v. Carter, 254 S.W.3d 335, 342-43 (Tenn. 2008). Thereafter, our supreme court revisited the standard of review to be applied to sentencing determinations and held that "sentences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" Bise, 380 S.W.3d at 708. Additionally, our supreme court has held that "the abuse of discretion standard, accompanied by a presumption of reasonableness, applies to within-range sentences that reflect a decision based upon the purposes and principles of sentencing, including the questions related to probation or any other alternative sentence." State v. Caudle, 388 S.W.3d 273, 278-79 (Tenn. 2012).

However, since the 2005 Amendments to the Sentencing Act, our supreme court has not ruled upon the standard of review to be utilized when reviewing a trial court's imposition of consecutive sentencing. See State v. Jeremy J. Edick, No. W2012-01123-CCA-R3-CD, 2013 WL 3130953, at *9 (Tenn. Crim. App. at Jackson, June 13, 2013). As such, this court

has been split regarding the proper standard of review when addressing consecutive sentencing. See State v. Colton D. Whitelow, No. W2012-00527-CCA-R3-CD, 2013 WL 3291889, at *2 (Tenn. Crim. App. at Jackson, June 25, 2013). We conclude that regardless of which standard is applicable, the trial court did not err by imposing consecutive sentencing.

Generally, "[w]hether sentences are to be served concurrently or consecutively is a matter addressed to the sound discretion of the trial court." State v. Adams, 973 S.W.2d 224, 230-31 (Tenn. Crim. App. 1997). Tennessee Code Annotated section 40-35-115(b) contains the discretionary criteria for imposing consecutive sentencing. See also State v. Wilkerson, 905 S.W.2d 933, 936 (Tenn. 1995). Because the criteria for determining consecutive sentencing "are stated in the alternative[,] . . . only one [criterion] need exist to support the appropriateness of consecutive sentencing." State v. Mickens, 123 S.W.3d 355, 394 (Tenn. Crim. App. 2003). The trial court may impose consecutive sentencing upon finding the existence of any one of the criteria. In the instant case, the trial court imposed consecutive sentencing based upon three criteria: (1) that the appellant was a professional criminal who had knowingly devoted his life to criminal acts as a major source of livelihood; (2) that the appellant was an offender whose record of criminal activity was extensive; and (4) that the appellant was a dangerous offender whose behavior indicated little or no regard for human life and who had no hesitation about committing a crime in which the risk to human life was high. Tenn. Code Ann. § 40-35-115(b)(1), (2), and (4).

With respect to the professional criminal criterion, the appellant argues that the trial court erred by applying this criterion based solely on the appellant's admission that he was a drug dealer. The appellant argues that he was only nineteen years old at the time of the offenses and that there was no evidence that he ever earned a "livelihood" from drug dealing in the sense of acquiring an appreciable sum of money or assets. Regardless, the appellant admitted that he had never held a job, with the exception of a brief stint at KFC, and that he had sold drugs "to get by." These admissions fully suffice to support the trial judge's conclusion that the State had established by a preponderance of the evidence that the appellant had knowingly devoted his life to criminal activity as a major source of livelihood.

As we stated earlier, a trial court may impose consecutive sentencing after finding any one of the criteria. Therefore, because the trial court did not err in imposing consecutive sentencing upon finding that the appellant was a professional criminal, any error in applying either criteria (2) or (4) is harmless. See Tenn. R. App. P. 36(b).

After a full review of the record, we conclude that the effective sentence of forty-nine years that was imposed in this case was reasonable and was consistent with the principles and purposes of sentencing. See Tenn. Code Ann. §§ 40-35-103 and 40-35-103. The appellant's

claim that the trial court erred by sentencing him to partial consecutive sentences is denied.

### III.  Conclusion

For the foregoing reasons, the judgments of the trial court are affirmed.

_____
NORMA McGEE OGLE, JUDGE