# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
Assigned on Briefs December 2, 2014

## STATE OF TENNESSEE v. CEDRIC TAYLOR

**Appeal from the Criminal Court for Shelby County**
No. 13-00173    J. Robert Carter, Jr., Judge

**No. W2014-00329-CCA-R3-CD  - Filed January 8, 2015**

Appellant, Cedric Taylor, was convicted of aggravated robbery, a Class B felony; aggravated burglary, a Class C felony; and employing a firearm during the commission of a dangerous felony, a Class C felony, for which he received an effective sentence of eleven years in the Tennessee Department of Correction.  In this appeal, he challenges the sufficiency of the evidence underlying his convictions.  Upon our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROGER A. PAGE, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and D. KELLY THOMAS, JR., JJ., joined.

Stephen C. Bush, District Public Defender; and Tony N. Brayton (on appeal), Nigel Lewis (at trial), and Amy G. Mayne (at trial), Memphis, Tennessee, for the appellant, Cedric Taylor.

Herbert H. Slatery III, Attorney General and Reporter; Caitlin Smith, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Joshua Corman, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

This case arises from appellant's forced entry into the victim's residence and subsequent robbery during which appellant stole the victim's purse.

### I. Facts

At appellant's October 2013 trial, the State called the victim as its first witness.  On June 23, 2012, the victim lived on Longfellow Road in Memphis.  That night, a friend picked

her up at her home to go dancing at a club called "Eclipse." Thereafter, the women had dinner at a restaurant, and the victim arrived at her residence between 4:00 and 4:30 a.m. on June 24. As the victim opened the outer black iron door and entered her home, her friend drove away. The victim reached behind her to close the outer door, and she observed two black males, one pointing a gun at her. The male who held the gun pushed her through her open inner door and into her house. She called out to "Mario," one of the individuals with whom she lived at the time, but the male struck her in the head with the gun and instructed her to "shut up." At that point, the second male entered the residence. They "grabbed" the victim, "pushed" her, and then took her handbag. The victim was bleeding from the attack.

After the two males stole the victim's purse, they fled from the residence, and the people with whom she lived entered the room. They called the police and an ambulance, and the victim was later transported to the hospital via ambulance. The victim stated that she required staples in her head as a result of being struck with the gun.

The victim stated that the perpetrator who held the gun and struck her was dressed all in black with white lettering on his shirt. He also had long hair with dreadlocks, a braid in the back of his hair, a goatee, and a beard. She believed him to be between twenty-three and twenty-seven years of age. The other male was also dressed in black and had short hair with a "line" and acne on his face.

A few days later, the victim spoke with Detective Ivan Lopez who showed her a photograph array from which she identified the perpetrator who had wielded the weapon and struck her on the head. She testified at trial that she was "a hundred percent sure that it [was] him[sic]" whom she recognized from the photograph.

The State's next witness was Officer Mitchell McDaniel with the Memphis Police Department. He testified that he responded to the call on Longfellow Road involving the victim, and he recalled encountering the victim and observing a laceration on her head. After the victim was transported to the hospital, Officer McDaniel, who was also certified in fingerprint collection, remained on the scene and attempted to obtain prints from the door handle but was unsuccessful. He was, however, able to lift prints from a coffee table in the living room.

Detective Lopez with the Memphis Police Department's robbery division testified next and stated that he first made contact with the victim at the hospital on June 24 where she was being treated for her head injury. At that time, the victim provided an explanation of the events and descriptions of the perpetrators who had been involved in the robbery and assault on her. Detective Lopez also photographed the victim's injuries.

Detective Lopez stated that on June 26, appellant became a suspect in the investigation, which caused him to create a photograph array for the victim to view. He showed the array to the victim on June 27, and she positively identified appellant from the array. Detective Lopez identified appellant in court and explained that appellant had cut his hair and no longer had dreadlocks.

Appellant called Tamika Farmer as his first witness, who provided an alibi for appellant for the day and time of the robbery. She testified that he was present with her at the home where they resided with appellant's cousin and his cousin's wife. She stated that they ate dinner, watched movies, and stayed up late talking and "being intimate" and that they did not go to sleep until at least around 5:00 a.m. She was certain of the time because one of the other individuals in the residence had to wake up early for work, which caused Ms. Farmer to check the clock and confirm that it was around 5:00 a.m. Ms. Farmer stated that the next morning they smelled breakfast cooking and went to the kitchen to eat with everyone else. She said that the events were clear in her mind because "that was the last time [she] actually had time to spend with . . . the love of [her] life."

Appellant then testified in his own defense. He said that on Saturday June 23, he was at home watching television. A family member who was visiting from California came over and brought her three-month-old son. At one point, appellant and his cousin walked to the grocery to purchase items for dinner and for breakfast the following morning. He recalled that his cousin and cousin's wife prepared the evening meal, and they "sat around and watched [television]." Appellant stated that around 8:00 or 9:00 p.m., each couple retired to their respective bedrooms, where appellant and Ms. Farmer continued to watch television, talk, and be "intimate" with each other. Appellant testified that the following morning, appellant and Ms. Farmer arose between 7:00 and 8:00 a.m. and joined his cousins in the kitchen to help prepare breakfast. They relaxed and enjoyed the rest of the day together.

Appellant denied that he was trying to "hide" anything by changing his appearance before trial. He explained that he had to cut his hair because while he was incarcerated, he could not "get the right shampoo and the right grease that [he] was using while [he] was free[,] [s]o that [caused] him to get rid of [it] because it was making . . . it uncomfortable for [him] and [he] just couldn't take care of it."

On cross-examination, appellant acknowledged that on June 24, 2012, he was in possession of a black handgun. Appellant denied having told Ms. Farmer and his father in telephone calls from jail that he cut his hair to impede the victim's identification of him. Appellant testified that he "had nothing to do with this" and that the entire situation "has been a mistake." He claimed that "the police didn't have [any] leads and they just used [him]

as . . . a way to put all these charges on [him] because [he] was black and [he] had dreadlocks."

Appellant called Josephine Jones, the wife of appellant's cousin and one of the people with whom appellant and Ms. Farmer lived, as his next witness. Ms. Jones testified that she had the only key to her home at the time appellant and Ms. Farmer resided with her and her husband. On cross-examination, Ms. Jones stated that when defense counsel first met with her, she felt "like he was leading [her] to say things." She acknowledged that she was supposed to testify in court that she recalled having a big breakfast with her husband, appellant, and Ms. Farmer on the morning in question but that she had no recollection of having done so. Furthermore, the cousin who lived in California was not visiting at the time and was not present in their home. Ms. Jones confirmed that the breakfast to which Ms. Farmer and appellant testified did not happen. She also said that she did not work on Sundays, so she did not leave the house as Ms. Farmer had stated. Ms. Jones stated that although she possessed the only key to the residence, one did not require a key to leave the house.

Appellant's final witness was Dr. Jeffrey Neuschatz, who was accepted by the court as an expert in the field of cognitive psychology with an area of study in eyewitness identification. He testified that there are two types of memories – those that are more likely to be impaired and those that are less likely to be impaired. He compared the memories less likely to be impaired with weddings or football games; individuals have ideas about what happens in those situations, and they insert parts of their memory to formulate a consistent story. However, the memories that are more likely to be impaired or "that are more susceptible to impairment or errors are ones we can't rehearse [or] that we see for a short period of time then we only see once and we can't do over and over again." Dr. Neuschatz said that the ideal environment for formulating memory is a well-lit room with no distractions in which one could review the material repeatedly. Conditions that promote inaccurate memories include insufficient time to "rehearse" the information, background noise, and poor lighting.

With regard to the instant case, Dr. Neuschatz stated that he had reviewed the discovery and characterized the incident as a "highly stressful situation." He said that research indicated that as one's stress level increases, his or her ability to make an accurate identification decreases, which in turn reduces the reliability of eyewitness memory. Dr. Neuschatz further explained that when a weapon is involved, the principle of "weapon focus" suggests that the weapon attracts the person's attention so that they cannot accurately perceive other aspects of the scene. He also said that the correlation between confidence and accuracy of an identification was "very weak," which meant that the fact that the victim

expressed confidence in her identification of appellant did not equate with the accuracy of it.

Dr. Neuschatz explained the concept of cross-racial identification as it related to the victim's being of Hispanic origin and appellant's being African-American. He said that different races have different facial features that are distinctive and that if one is from another race, he or she would be unfamiliar with those distinctive features, rendering it more difficult to make an accurate identification. He opined that the inherent racial bias has a "very big magnitude" in eyewitness identification.

Dr. Neuschatz testified about pre-identifications in which an individual expects that a suspect is pictured in a line-up and suggestive line-ups in which an individual can pick out a suspect based solely on a description without having witnessed the event. He said that there are four elements of a "good" line-up: (1) the witness should be instructed that a suspect may or may not be pictured in the line-up; (2) the person conducting the line-up should not know the identity of the suspect to avoid giving subliminal cues; (3) each photograph in the line-up should correspond to the description of the suspect given by the witness; and (4) a "confidence statement" should be taken, asking how confident the witness is about their identification. Dr. Neuschatz said that in this case, some of the criteria were met, but not all.

On cross-examination, Dr. Neuschatz admitted that he did not speak with the victim in this case about her identification of appellant or to the law enforcement officer regarding the procedures he followed in administering the line-up. In fact, Dr. Neuschatz had never spoken with a victim in a criminal case as part of his research. He confirmed that he was *not* testifying that the victim was wrong in her identification of appellant or that she could *not* identify an African-American suspect.

Following the close of the defense's proof, the jury deliberated and found appellant guilty as charged of aggravated robbery, aggravated burglary, and employing a firearm during the commission of a dangerous felony. In a subsequent sentencing hearing, the trial court sentenced appellant to nine years for aggravated robbery, five years for aggravated burglary, to be served concurrently with each other, and six years for the firearm conviction to be served consecutively to the five-year sentence, for an effective sentence of eleven years to be served in the Tennessee Department of Correction.[1]

---

[1] Because appellant does not raise a sentencing issue in this appeal, we have dispensed with a recitation of the facts from the sentencing hearing.

-5-

## II. Analysis

Appellant presents one issue for our review: the sufficiency of the convicting evidence. The standard for appellate review of a claim challenging the sufficiency of the State's evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (citing *Johnson v. Louisiana*, 406 U.S. 356, 362 (1972)); *see* Tenn. R. App. P. 13(e); *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011). To obtain relief on a claim of insufficient evidence, appellant must demonstrate that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319. This standard of review is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977).

On appellate review, "'we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom.'" *Davis*, 354 S.W.3d at 729 (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)); *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). In a jury trial, questions involving the credibility of witnesses and the weight and value to be given the evidence, as well as all factual disputes raised by the evidence, are resolved by the jury as trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). This court presumes that the jury has afforded the State all reasonable inferences from the evidence and resolved all conflicts in the testimony in favor of the State; as such, we will not substitute our own inferences drawn from the evidence for those drawn by the jury, nor will we re-weigh or re-evaluate the evidence. *Dorantes*, 331 S.W.3d at 379; *Cabbage*, 571 S.W.2d at 835; *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984). Because a jury conviction removes the presumption of innocence that appellant enjoyed at trial and replaces it with one of guilt at the appellate level, the burden of proof shifts from the State to the convicted appellant, who must demonstrate to this court that the evidence is insufficient to support the jury's findings. *Davis*, 354 S.W.3d at 729 (citing *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011)).

As charged in the indictment in this case, a person commits the offense of aggravated robbery by the "intentional or knowing theft of property from the person of another by violence or putting the person in fear" and the theft is "[a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon." Tenn. Code Ann. §§ 39-13-401, -402. To sustain a conviction for aggravated burglary as charged in the indictment, the State must prove that appellant entered a habitation without the effective consent of the property owner and with the intent to commit

theft. *See* Tenn. Code Ann. §§ 39-14-402, -403. Tennessee Code Annotated 39-17-1324(b)(1) provides, "It is an offense to employ a firearm during the commission of a dangerous felony," of which aggravated burglary is one. *Id.* § 39-17-1324(i)(1)(H).

The evidence received at trial established that two black males armed with a firearm encountered the victim at her front door. They forcibly pushed her through the front door of the residence and followed her inside. There, the armed male, later identified as appellant, struck the victim in the head with the gun when she attempted to cry out for help. Having immobilized the victim, they stole her purse, and the two men fled the scene. The victim described that appellant held the gun and struck her and that he had long hair with dreadlocks, a braid in the back of his hair, a goatee, and a beard. She believed him to be between twenty-three and twenty-seven years of age. When shown a photograph array by Detective Lopez a few days later, the victim identified appellant as the perpetrator who wielded the weapon and struck her on the head. She testified at trial that she was "a hundred percent sure that it [was] him [sic]" whom she recognized from the photograph. During trial, appellant admitted that at the time of the incident, he was in possession of a black handgun. From these facts, the jury had before it sufficient evidence by which to convict appellant of aggravated robbery, aggravated burglary, and employing a firearm during the commission of a dangerous felony.

Appellant's sole challenge to the sufficiency of the evidence underlying his convictions is that the State's only "evidence" was the eyewitness testimony of the victim; the State presented no further physical evidence, such as fingerprint evidence, connecting appellant to the offenses. However, it is well-settled in Tennessee that the credibility of eyewitness testimony connecting a perpetrator to the criminal offense(s) for which he stands trial is a question of fact for the jury's consideration based on all competent proof. *State v. Strickland*, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993) (citing *State v. Crawford*, 635 S.W.2d 704, 705 (Tenn. Crim. App. 1982)). In addition, a victim's testimony identifying the accused as the perpetrator of an offense is sufficient to support a conviction in and of itself. *See Strickland*, 885 S.W.2d at 87; *State v. Williams*, 623 S.W.2d 118, 120 (Tenn. Crim. App. 1981).

In this case, defense counsel thoroughly cross-examined the victim and Detective Lopez about the propriety and potential suggestibility of the line-up he employed. The victim expressed confidence in her identification of appellant, and Detective Lopez confirmed that the line-up was properly assembled. Moreover, defense counsel presented an expert in the field of cognitive psychology whose primary field of study was eyewitness identification. Considering all competent evidence, the jury obviously credited the victim's testimony, as was its prerogative. The jury had before it sufficient evidence to sustain appellant's convictions.

## CONCLUSION

Based on our review of the record, the briefs of the parties, and the applicable case law, we affirm the judgments of the trial court.

_____
ROGER A. PAGE, JUDGE