IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs September 26, 2023

## STATE OF TENNESSEE v. RONY NOE AMBROCIO CRUZ

**Appeal from the Criminal Court for Cumberland County**
**No. 2020CR195     Gary McKenzie, Judge**

_____

### No. E2023-00357-CCA-R3-CD

_____


Defendant, Rony Noe Ambrocio Cruz, was convicted by a Cumberland County jury of second degree murder. The trial court sentenced Defendant to twenty-five years to serve at 100%. On appeal, Defendant argues that the evidence was insufficient to support his second degree murder conviction. He also contends that the trial court erred in sentencing when it applied an enhancement factor related to his immigration status. After a thorough review of the record and the parties' briefs, we affirm the judgment of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed

JILL BARTEE AYERS, J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and TIMOTHY L. EASTER, JJ., joined.

Jeffrey A. Vires, Crossville, Tennessee, for the appellant, Rony Noe Ambrocio Cruz.

Jonathan Skrmetti, Attorney General and Reporter; Edwin Alan Groves, Jr., Assistant Attorney General; Bryant C. Dunaway, District Attorney General; Philip Hatch and Allison Null, Assistant District Attorneys General, for the appellee, State of Tennessee.


## OPINION

### Factual and Procedural History

*Trial*

Around 6:00 a.m. on August 2, 2020, Officers Joel Stevens and Samantha Seay of the Crossville Police Department responded to a 911 call from the Centennial Park area. When they arrived at the park, they found Defendant standing in the grass. As they

approached him, Defendant began speaking to them in Spanish. Officer Stevens called Officer Casey Peters, who spoke Spanish; Officer Peters spoke to Defendant over the phone. Officer Peters testified that "the first thing out of [Defendant's] mouth" was that he was "at fault for a murder." Defendant told Officer Peters that the victim was his spouse, and he repeatedly mentioned that he took her to the woods because he "didn't want to kill her in front of the kids." Based on Defendant's statement to Officer Peters, officers detained Defendant. Officer Peters then traveled to Centennial Park to assist with the investigation. When Officer Peters asked Defendant to show him where the victim's body was located, Defendant had a difficult time explaining the location. Officer Peters and Defendant then got in Officer Peters' vehicle, and Defendant directed him to Village Lane, where Defendant's apartment was located. Defendant pointed out the woods across the street where he said he had placed the victim's body. According to Officer Peters, the body was found "exactly where [Defendant] had told" them it would be. Officer Cory Kelsch testified that the woodline was across the street from Defendant's apartment, and the victim's body was found roughly thirty to forty yards inside the woodline.

Special Agent Shawn Scott with the Tennessee Bureau of Investigation ("TBI") interviewed Defendant later that day. In the interview, Defendant detailed the events that led up to his 911 call. Defendant and the victim had been married fourteen years, but they had not been communicating or sleeping in the same room for about four months. Defendant did not know where the victim was working at that time. Around 1:00 a.m. on August 2, Defendant found the victim in her bedroom naked on a video call with another person. Defendant stated that the victim had done this before, and he "just got fed up." An argument ensued, and the victim struck him with a phone cord. Defendant stated in the interview that he then went to his bedroom and went to sleep. Around 4:30 a.m., the victim came into Defendant's room, and they began arguing again. According to Defendant, the victim then went outside, and he followed her onto the street where they continued arguing. Defendant stated repeatedly that he did not remember anything after that point. He told Special Agent Scott that he did not remember how the victim died, how her body got into the woods, or how he got to the park. He remembered only that he killed her, and he stated, "what's done is done."

Dr. Gulpreet Singh Bowman,[1] a forensic pathologist, testified as to the injuries found on the victim's body. The victim had two incised wounds on her face, which caused injury to the deep muscles of her face and chin but did not injure any vital structures. The victim also had a chest wound that was caused by something sharp and long, such as a knife, which pierced the right lung before penetrating the front and back of the heart. This wound was several centimeters deep, and it resulted in blood loss into the chest cavity and

---

[1] The transcript spells Dr. Bowman's name as Gulpreet Fingh Bowman; however, his curriculum vitae exhibited to his testimony reflects that his name is Gulpreet Singh Bowman.

heart sac. There were also abrasions on the victim's back, neck, and chest. Dr. Bowman also testified to multiple injuries that indicated strangulation. Almost every single muscle of the neck was hemorrhagic. Petechiae were also found, which can be associated with asphyxia and strangulation. Dr. Bowman testified that either the strangulation or stabbing alone could have killed the victim; he could not determine the order in which the injuries occurred. As a result, he concluded that the cause of death consisted of all three types of injuries: multiple sharp force injuries, blunt force injuries, and strangulation. The manner of death was homicide.

Defendant was charged with first degree premeditated murder. The jury found him guilty of the lesser included offense of second degree murder.

*Sentencing Hearing*

The trial court conducted a sentencing hearing on October 3, 2022. The applicable sentencing range for Defendant's conviction was fifteen to twenty-five years. T.C.A.§ 39-13-210(c)(1), 40-35-112(a)(1). The State argued for a twenty-five-year sentence based on application of several enhancement factors. Defendant requested a seventeen-year sentence, arguing a number of mitigating factors. The presentence report was entered as an exhibit at the sentencing hearing, and the Risk and Needs Assessment scored Defendant "high for violence." Additionally, the report noted that Defendant reported hearing voices from Satan telling him to do terrible things in the weeks leading up to the offense.

TBI Special Agent Shawn Scott testified at the sentencing hearing about the investigation and based on his experience, he believed that the victim's body would have ultimately been located if Defendant had not shown law enforcement where it was. The victim's body was not very far from residences in the community. Special Agent Scott was also asked about Defendant's immigration status:

> THE COURT: And based on your investigation in this particular case, were you able to determine the status of Mr. Cruz's presence here in the United States?
>
> WITNESS: Yes, sir. He was here illegally.

The trial court started its analysis with a presumption of a sentence at the midpoint of the range: twenty years, then applied mitigating factor (10), that the defendant assisted the authorities in locating or recovering any property or person involved in the crime. T.C.A. § 40-35-113. However, the trial court did not give this factor much weight based on Special Agent Scott's testimony that the victim's body would have likely been discovered without Defendant's assistance.

- 3 -

The trial court then applied four enhancement factors set forth in Tennessee Code Annotated section 40-35-114, first, addressing factor (5), that Defendant treated the victim with exceptional cruelty during the commission of the offense, and (6), that the personal injuries inflicted upon the victim were particularly great. The trial court noted that factor (5) "really also encompasses" factor (6). The trial court described the crime as a "very violent, very intimate attack" that involved stabbing, strangulation, and blunt force trauma. The court next applied factor (9), that the defendant possessed or employed a deadly weapon during the commission of the offense, stating that it considered the sharp object to be a deadly weapon. The trial court gave this factor "great weight."

Finally, the court applied two enhancement factors related to Defendant's immigration status. First, the trial court applied factor (1), that Defendant had a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range. Relying on Special Agent Scott's testimony, the trial court found that Defendant was in the country illegally, constituting a sustained violation of the law. The court gave that factor "great, great weight." The court also applied factor (28), that Defendant was illegally or unlawfully in the United States at the time the instant offense was committed. After applying the enhancement factors and mitigating factor, the trial court sentenced Defendant to a twenty-five-year sentence to be served at 100%. The court explained that there were numerous ways to get to twenty-five years. First, that any one of factors (1), (9), or (28) could raise the sentence to twenty-five years on its own; second, the trial court found that factor (6), combined with factors (1) and (9), would together raise the sentence to twenty-five years; and third, that factor (6) combined with factor (28) would bring the sentence to twenty-five years.

Defendant filed a motion for a new trial, which was denied on January 9, 2023. He then filed a timely notice of appeal.

## Analysis

On appeal, Defendant argues that the evidence was insufficient to sustain his conviction for second degree murder, arguing that the evidence supported a voluntary manslaughter conviction. Additionally, Defendant argues that the trial court misapplied enhancement factor (28) at sentencing because the evidence was insufficient to establish that he was illegally or unlawfully in the United States at the time of the offense.

### I.      Sufficiency of the Evidence

Defendant argues that the evidence was insufficient to support his conviction for second degree murder because the evidence produced at trial established "adequate provocation" and "state of passion" such that "no reasonable trier of fact could have

returned a verdict of second degree murder[.]" He asserts that the evidence instead supports a conviction for voluntary manslaughter. The State argues that the jury reasonably rejected Defendant's theory of voluntary manslaughter, and the evidence could easily lead a jury to conclude that Defendant was reasonably certain that his actions would result in death. We agree with the State.

When evaluating the sufficiency of the evidence, an appellate court must ask "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Mitchell*, 592 S.W.3d 431, 436 (Tenn. 2019) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *see* Tenn. R. App. P. 13(e). A jury verdict removes the presumption of innocence and replaces it with the presumption of guilt. *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011) (citing *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992)). On appeal, it is not the appellate court's role to reweigh the evidence. *Id.* (citing *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Questions such as witness credibility, the weight to be given to witness testimony, and factual issues are matters to be resolved by the jury. *Byrge v. State*, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978) (citing *Withers v. State*, 523 S.W.2d 364, 369 (Tenn. Crim. App. 1975)). The appellate court therefore must draw "all reasonable and legitimate inferences in favor of the State." *Davis*, 354 S.W.3d at 729 (citing *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)).

Second degree murder is defined as the "knowing killing of another." T.C.A. § 39-13-210(a)(1). A person acts knowingly when he is aware that his conduct is "reasonably certain to cause the result." *Id.* § 39-11-302(b). In contrast, the lesser included offense of voluntary manslaughter is "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." *Id.* § 39-13-211(a). Whether an act constitutes a "knowing killing," as required for a conviction of second degree murder, or a killing that occurred due to "adequate provocation" is a question for the jury. *State v. Johnson*, 909 S.W.2d 461, 464 (Tenn. Crim. App. 1995).

When viewed in the light most favorable to the State, the evidence demonstrates that Defendant found his wife naked in bed video-calling with another person. While Defendant and the victim did argue when he discovered her in that state, he went to sleep. The next morning, when the victim was preparing to leave for work, the argument resumed. It was then that Defendant followed the victim outside where he inflicted sharp force injuries, blunt force injuries, and strangulation, causing the victim's death. Defendant confessed to the murder after police arrived. According to the translation by Officer Peters, Defendant took the victim to the woods because he did not want to kill her in front of the children. Defendant told police he did not remember what happened, but he directed law enforcement to her body in the woods.

By finding Defendant guilty of second degree murder, the jury necessarily rejected all other lesser offenses, including voluntary manslaughter. *See State v. Williams*, 977 S.W.2d 101, 106 (Tenn. 1998). Based on the evidence, a rational jury could have concluded beyond a reasonable doubt that Defendant was reasonably certain his actions would result in the victim's death and that he did not act under a "state of passion" produced by "adequate provocation." Defendant is not entitled to relief.

## II. Sentencing

Defendant argues that the trial court abused its discretion in applying enhancement factor (28) because the proof failed to establish that he was in the country illegally at the time of the offense. He asserts that the evidence presented to the court at the sentencing hearing only established that Defendant was in the country illegally, not specifically that he was here illegally at the time of the offense. Defendant does not challenge the trial court's application of the remaining three enhancement factors, which the record shows were properly applied. The State argues that the evidence fully supports the trial court's application of this factor, and even if it did not, misapplication of a single factor does not invalidate Defendant's sentence. We agree with the State.

The party challenging the length of a sentence bears the burden of showing that the sentence was improper. *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). In making sentencing decisions, trial courts must consider: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the conduct involved; (5) evidence and information offered by the parties on the statutory mitigation and enhancement factors set out in Tennessee Code Annotated §§ 40-35-113 and 40-35-114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement the defendant wishes to make on his own behalf; and (8) the result of the validated risk and needs assessment conducted by the department and contained in the presentence report. *See* T.C.A. § 40-35-210(b).

This court reviews challenges to the length of a sentence that is within the appropriate sentencing range for abuse of discretion with a "presumption of reasonableness." *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012). A sentence imposed by the trial court that is within the applicable range should be upheld so long as it is "consistent with the purposes and principles of sentencing." *Id.* at 706. While trial courts are guided by the enhancement and mitigating factors delineated in Tennessee Code Annotated sections 40-35-113 and 40-35-114, they are not bound by these factors. *Id.* Therefore, a trial court's misapplication of an enhancement or mitigating factor does not invalidate the imposed sentence unless the trial court "wholly departed" from the

Sentencing Act.  *Id.*  "Mere disagreement with the trial court's weighing of the properly assigned enhancement and mitigating factors is no longer a ground for appeal."  *Id.*

Tennessee Code Annotated section 40-35-114 sets out twenty-eight enhancement factors a trial court can consider in imposing a sentence.  Factor (28) provides: "At the time the instant offense was committed, the defendant was illegally or unlawfully in the United States."  At Defendant's sentencing hearing, Special Agent Scott was asked if during his investigation he was able to determine the status of Defendant's presence in the United States, to which Special Agent Scott replied, "Yes, sir.  He was here illegally."  Defendant contends that Special Agent Scott's testimony is insufficient to establish that Defendant was illegally in the United States *at the time of the offense*.  He asserts that, because the killing and the sentencing hearing were over two years apart, there was no evidence before the trial court as to his status at the time the killing occurred.  We disagree.  It was reasonable for the trial court to find from Special Agent Scott's testimony that Defendant was illegally or unlawfully in this country at the time of the offense.  That information, along with information in the presentence report that Defendant did not have a social security number, was sufficient for the trial court to find by a preponderance of the evidence that Defendant was in the country illegally at the time of the offense.

However, even if the trial court erred in applying enhancement factor (28), Defendant is not entitled to relief.  Defendant contends that, despite the fact that the trial court stated it came to the twenty-five-year sentence in "alternative ways," the sentence was in error because the trial court stated it would have arrived at its decision based on factor "[28] alone."  The record does not support Defendant's argument.  The trial court explicitly stated that it could arrive at the twenty-five-year sentence even without consideration of factor (28).  At the sentencing hearing, the trial court explained that application of either factor (1) or factor (9) on its own could bring the sentence to twenty-five years.  Additionally, the trial court stated that factor (6) combined with factors (1) and (9) could bring the sentence up to twenty-five years.  In the trial court's analysis and application of the enhancement factors, it would have imposed the twenty-five-year sentence regardless of factor (28).  Additionally, even if the trial court had misapplied factor (28), the misapplication would not invalidate the sentence.  *See Bise*, 380 S.W.3d at 706.  The trial court imposed a sentence within the range after consideration of the purposes and principles of sentencing.  Defendant is not entitled to relief.

**CONCLUSION**

For the foregoing reasons, the judgment of the trial court is affirmed.


_____

JILL BARTEE AYERS, JUDGE