IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
April 9, 2024 Session

**STATE OF TENNESSEE v. CHRISTOPHER C. WHITE**

**Appeal from the Circuit Court for Dickson County**
**No. 22CC-2016-CR-371   David D. Wolfe, Judge**

_____

**No. M2023-00964-CCA-R3-CD**

_____

After a bench trial, Defendant, Christopher C. White, was found guilty of one count of theft valued at $10,000 or more but less than $60,000.  The trial court imposed a four-year sentence, suspended to probation, and ordered Defendant to pay $10,228 in restitution.  On appeal, Defendant argues (1) the evidence was insufficient to support his conviction; (2) this court lacks subject matter jurisdiction to consider Defendant's appeal; and (3) collateral estoppel required the trial court to dismiss the case.  After review, we conclude the evidence is insufficient to support Defendant's conviction for theft.  Accordingly, we reverse the judgment of the trial court, vacate Defendant's conviction, and dismiss the case.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed;**
**Conviction Vacated; Case Dismissed**

MATTHEW J. WILSON, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN, P.J., and TIMOTHY L. EASTER, J., joined.

Mark C. Scruggs, Nashville, Tennessee, for the appellant, Christopher C. White

Jonathan Skrmetti, Attorney General and Reporter; Benjamin A. Ball, Senior Assistant Attorney General; W. Ray Crouch, Jr., District Attorney General; and Talmadge Woodall, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

I. Background
A. Factual Summary
Many of the material facts of this case, as set forth by the testimony and exhibits introduced during the bench trial in this matter, are not in dispute.  On December 15, 2014,

Rebecca Munk[1] contracted with Defendant's company, CountryWide Barns and Buildings ("CountryWide"), to build a house in Dickson County. Per the terms of the contract, Ms. Munk was to pay CountryWide a series of "draws" or installments as follows:

| Payment No.[2] | Description/Stage of Construction | Payment Amount |
|---|---|---|
| 1 | At signing of [initial] P.O. for official plan and material list development | $57,837.81 |
| 2 | Upon first material delivery | $57,837.81 |
| 3 | Upon completion of framing | $57,837.80 |
| 4 | Upon building enclosed from weather | $57,837.80 |
| 5 | Interior complete | $43,378.35 |
| 6 | Final payment | $14,459.45 |

At trial, Ms. Munk testified she understood that per the contract, she was not responsible for paying subcontractors. Rather, Defendant would pay subcontracting companies to perform work on the house using the funds provided by Ms. Munk.

Among other provisions, the contract provided, "All changes to the Services by Customer, including but not limited to changes to the style, design, color, pattern or trim of the Improvement, shall not be undertaken by [CountryWide] without a written change order." Furthermore, the contract provided, "Customer acknowledges and agrees that [CountryWide]'s worksite personnel do not have the authority to bind [CountryWide] to any agreement, oral or written."

Ms. Munk paid the first installment the day the contract was signed, and work began on the house. Plans for the house initially called for a garage to be built, but on January 12, 2015, CountryWide drafted a change order reflecting the parties' new agreement to build a basement instead of a garage. Ms. Munk signed the agreement the following day. Both Defendant and Ms. Munk testified at trial that the change in building plans developed before the change order was signed, but they differed on how it happened. Ms. Munk testified that CountryWide employees informed her that the change from a garage to a basement was needed because of grading issues at her property, while Defendant testified that Ms. Munk and the subcontractor handling the excavation changed the building plans without notifying Defendant or anyone with CountryWide. Defendant testified that he

---

[1] At the time the contract was executed, Ms. Munk was known as Rebecca Bear. The contract references her accordingly. However, we will reference Ms. Munk as she was referenced at trial—Rebecca Munk.

[2] There are no payment numbers 3 or 6 in the contract. We have renumbered the payment list accordingly to avoid confusion.

learned about the change in building plans only after visiting the worksite and discovering that the subcontracted excavating company had begun to build the basement.

Ms. Munk paid the first three installments on December 15, 2014, February 5, 2015, and April 13, 2015, although she testified that for the second installment, CountryWide "tried to get me to pay before the material had been delivered." She also paid the full $31,380 cost of the basement, and the planned cost of the garage, $20,339.28, was credited to her account.

On July 2, 2015, the parties agreed to a second change order, with Ms. Munk paying an additional $13,787.89 for a retaining wall eleven days later. However, at some point before this second change order was executed, the relationship between CountryWide and Ms. Munk had begun to deteriorate. Emails between Ms. Munk and Defendant were introduced at trial that reflect their dispute. On May 22, 2015, Ms. Munk sent an email to Defendant and other persons involved with the build in which she aired certain grievances. She began her message by writing that "Communication and the lack [there]of has become a large issue." As particularly relevant to this appeal, Ms. Munk stated, "I am hearing YET AGAIN how contractors on the site are NOT GETTING PAID. There is a pattern developing here and it isn't looking good for [CountryWide]." (emphasis in original). However, Ms. Munk did not identify the specific contractors who claimed they were unpaid or the amounts they were owed. She also emailed about "the porch/deck situation"; at trial, Ms. Munk testified that CountryWide was contracted to build a concrete wraparound porch, but they built a wooden porch instead. She also claimed to have paid an installment for a "completed" framing job (listed as Payment No. 3 in the table above), although she did not, in fact, have a complete framing job.

On May 26, 2015, Defendant sent Ms. Munk a reply email that included the following:

> Contractors getting paid. I am so tired of guys saying this. Again Keith and his guys were to be paid 8000 for repair all framing, finish the porches, and put on all the metal and soffit on the outside. To date they have been paid 5900. And look at where it is. On Thursday kieth requested 2600 for pay for the week. I told him noway and paid him 1400. This way the day after I met with him and recorded the meeting where he understood we had to be 10% ahead to insure completion. I am having sashia send you today, their CPA's, this is the contract we get them to sign per job, and the payments to them out of the quick books. There is something not right when they go out to this job. They never say they have not been paid. We have three on this one that have said that. We are not recooping money I can guarantee you. We know the Gaines thing and the other two have killed me. Do me a favor,

look at your contract on framing, roofing, and siding. The money next to each item is what we should pay out. Then compare it to what I have paid out. You will see who is lying.

(Spelling in original). Ms. Munk and Defendant sent emails back-and-forth regarding the progress and timing of the build, but none of these subsequent emails addressed Ms. Munk's claims about payment issues. Ms. Munk testified at trial that she paid certain subcontractors who complained about not being paid. Other than All Tech Insulation as explained later in this opinion, Ms. Munk did not specify who these subcontractors were or how much she paid them.

On August 13, 2015, CountryWide issued an invoice to Ms. Munk for the $57,837.80 installment that was due. The contract stated this payment was due when the building was enclosed from weather, but Ms. Munk testified that the building was not so enclosed at that point. She testified that she paid only $45,000 of that invoice because CountryWide "had not finished the job. They needed the money. [Defendant] was pressuring me for paint colors and cabinets." She also said CountryWide pressured her by contacting her on days she was appearing in court and while she was dealing with the death of her son. Ms. Munk testified that she emailed Defendant—an email which does not appear in the record—stating, "I refuse to pay you any more money until you finish what should already be done, at this point." Payment records show that based on Ms. Munk's previous payments, the $45,000 payment resulted in her account with CountryWide having a positive credit of $7,663.88.

On October 9, 2015, CountryWide prepared a third change order in the amount of $27,733.55. This change order covered the building of a basement bathroom, completion of the wraparound porch, installation of an interior door, and core filling in the retaining wall, among other projects. Ms. Munk testified that she did not "approve" this change order. However, on October 28, 2015, Ms. Munk paid $28,000, which Defendant testified he applied to the work set forth in the third change order. This was her last payment to CountryWide. Ms. Munk testified that around November 2015, a retaining wall collapsed, but CountryWide never repaired it.

The only subcontractors specifically referenced in the record were the plumbing company, Precision Plumbing, and the insulation company, All Tech Insulation. Ms. Munk testified she received a letter from Precision Plumbing stating the company had not been paid by CountryWide. The letter, which was introduced into evidence, claimed the plumbing company was owed $7,015. The letter was dated December 23, 2015, which was after both Ms. Munk's last payment to CountryWide and when she said CountryWide stopped work on her house (in "October or November of 2015"). Ms. Munk testified that she did not pay Precision Plumbing because they did not place a lien on her house.

- 4 -

Conversely, in October 2015 the insulation company placed a lien on Ms. Munk's house based on the $3,213 the company claimed it was owed for work on her house. Ms. Munk testified she did not find out about the lien until she attempted to file a quitclaim deed on the property. In June 2017, she paid the $3,430 lien, which also included attorney's fees and a filing fee. A "Full Release of Judgment Lien" was signed by a representative of the insulation company in November 2019 acknowledging "full satisfaction of the indebtedness."

Thomas Krantz, owner of Precision Plumbing, testified at trial that he contracted with CountryWide to perform the plumbing work at Ms. Munk's residence. Precision Plumbing performed the work before Mr. Krantz sent Ms. Munk the December 23, 2015 letter. Mr. Krantz explained that he normally expected payment for Precision Plumbing's work about thirty days after completing the job, and if he was still unpaid within "a month to [sixty] days" later, he would start calling the business. Mr. Krantz testified that in this case, before sending the letter to Ms. Munk he visited what he thought were CountryWide's offices "[n]umerous times" but was unable to find anyone working there. No one from All Tech Insulation testified at trial.

Chris Morris, who was employed by CountryWide between September 2014 and October 2015, testified that around July 2015, CountryWide's name was changed to "Majestic Builders" and the company's office moved to a new location. Mr. Morris recalled subcontractors visiting CountryWide's offices on occasion to seek payment for work they had done on CountryWide projects, and he added that some of these subcontractors "kept coming back." Mr. Morris acknowledged that Defendant changed the locks on CountryWide's offices; Mr. Morris did not know why Defendant changed the locks, but he supposed that the locks were changed for "security reasons."

Defendant testified that his company did not pay the plumbers and insulators because the money that would have paid them came from the August 2015 installment, and Ms. Munk paid only $45,000 on that installment rather than the full amount of $57,837.80. When asked by the trial court why Defendant did not apply Ms. Munk's subsequent $28,000 payment to the money she supposedly owed on the partially paid installment, Defendant answered,

> So when you're a big company and you have that many going on, you can't—you can't send that $10,000 out if someone actually has money they should have to you, you know $10,000 to you, so you just wait until they send it in. Then immediately you send those checks.
>
> And we would—we would have done that on any job, because if you have 50, that's 500,000, if I did my math right. Then instantly you're—

you're chasing down, so you just wait until they pay, they catch up and be flush in their account.

And that's—that's what I'm—because there was still the 43, the 12, and then there was the B-Board that we did that we were going to address afterwards. So there was still a lot going on there.

Defendant testified that his company ultimately stopped work on Ms. Munk's house because Ms. Munk stopped paying. He claimed Ms. Munk owed his company $47,069.49, which she disputed.

## B. Verdict

Defendant was indicted on one count of home construction/home improvement services fraud under Tennessee Code Annotated section 39-14-154 and one count of theft of property valued at $60,000 or more but less than $250,000 under Tennessee Code Annotated section 39-14-105. During trial, Defendant moved to dismiss the fraud count because the version of section 39-14-154 in effect at the time Ms. Munk's home was built only criminalized home improvement services fraud and did not criminalize fraud related to new home construction. The current version of the statute, 2018 public chapter 547, amended the home improvement services fraud statute to include new home construction and did not become effective until July 1, 2018. Recognizing this, the trial court granted Defendant's motion and dismissed the fraud count. Defendant also moved to dismiss the theft count, but the trial court denied that motion. Although the indictment alleged theft in the amount of $570,244, the trial court found Defendant guilty of theft in the amount of $10,228, the amount of the plumbing and insulation services. The trial court found that Ms. Munk paid for those services as part of her payments to CountryWide, but Defendant failed to then use those funds to pay the subcontractors. The trial court specifically found Defendant's "explanation that the reason those were not paid is because she did not pay her portion of the last installment" was not credible.

The trial court imposed a four-year sentence, suspended to probation, and ordered restitution in the amount of $10,228. This appeal followed.

## II. Analysis

Defendant raises several issues related to his contention that this case is a contract dispute rather than a criminal case. He argues his conviction should be dismissed because "this court lacks subject matter jurisdiction and the evidence does not support the [trial] court's verdict." He also argues the trial court erred when it "failed to determine the rights and duties of the parties through an analysis of the contracts which establishes that a 'theft'

did not occur." Ultimately, we conclude that Defendant is entitled to relief because the State has failed to establish beyond a reasonable doubt that a theft occurred.

## A. Sufficiency of Evidence

### 1. Standard of Review

The standard of review for a claim challenging the sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original) (citing *Johnson v. Louisiana*, 406 U.S. 356, 362 (1972)); *see* Tenn. R. App. P. 13(e); *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011). This standard of review is identical whether the conviction relies on direct evidence, circumstantial evidence, or a combination of both. *State v. Williams*, 558 S.W.3d 633, 638 (Tenn. 2018) (citing *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011)).

A guilty verdict removes the presumption of innocence and replaces it with one of guilt on appeal, therefore, the burden is shifted to the defendant to prove why the evidence is insufficient to support the conviction. *Davis*, 354 S.W.3d at 729 (citing *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011)). On appeal, "we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom." *Id.* at 729 (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). "Questions concerning the credibility of the witnesses, the weight and value to be given the evidence[,] as well as all factual issues raised by the evidence, are resolved by the trier of fact, not this [c]ourt." *State v. Holder*, 15 S.W.3d 905, 911-12 (Tenn. Crim. App. 1999) (citing *State v. Tuttle*, 914 S.W.2d 926, 932 (Tenn. Crim. App. 1995)). "In a case tried without a jury, the verdict of the trial judge is entitled to the same weight on appeal as a jury verdict." *State v. Hatchett*, 560 S.W.2d 627, 630 (Tenn. 1978). Consequently, appellate courts are precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. *State v. Stephens*, 521 S.W.3d 718, 724 (Tenn. 2017).

### 2. Theft of Property

Theft of property occurs when, "with intent to deprive the owner of the property, the person knowingly obtains or exercises control over the property without the owner's effective consent." Tenn. Code Ann. § 39-14-103(a). "Consent is not effective" if it is "[i]nduced by deception or coercion." *See id*. § 39-11-106(a)(11)(A). As relevant to this case, "deception" occurs when a person knowingly "[c]reates or reinforces a false impression by words or conduct, including false impressions of fact, law, value or intention

or other state of mind that the person does not believe to be true." *Id.* § (a)(7)(A)(i). Deception also occurs when a person knowingly:

> Promises performance that at the time the person knew the person did not have the ability to perform or that the person does not intend to perform or knows will not be performed, except mere failure to perform is insufficient to establish that the person did not intend to perform or knew the promise would not be performed.

*Id.* § (a)(7)(A)(vi)(a). "The intent to deprive may be based solely upon circumstantial evidence, and a 'jury may infer a . . . defendant's intent from the surrounding facts and circumstances.'" *State v. Stewart*, No. M2019-01421-CCA-R3-CD, 2020 WL 6494838, at *11 (Tenn. Crim. App. Nov. 5, 2020) (omission in original) (quoting *State v. Roberts*, 943 S.W.2d 403, 410 (Tenn. Crim. App. 1996)).

"Situations involving alleged fraud in connection with home repairs or installations present a unique challenge under the theft statute." *State v. Hutchinson*, No. E2010-01053-CCA-R3-CD, 2011 WL 1621997, at *5 (Tenn. Crim. App. Apr. 25, 2011). Facts which establish a breach of contract may not necessarily reflect an intent to defraud or constitute "deception" within the meaning of our criminal code. *See State v. Amanns*, 2 S.W.3d 241, 245 (Tenn. Crim. App. 1999).

*Amanns* and *Hutchinson*, cited by both parties in their briefs, were cases in which home contractors were convicted of theft. Of these two opinions, *Amanns* is more similar factually to the present case. In *Amanns*, a homeowner entered into a contract with the defendant, a contractor, to remodel the homeowner's basement for $16,000. *Id.* at 242. The homeowner paid an initial $6,000 payment to the defendant, who promptly cashed the check and "deposited the sum of $1,760.57 with 84 Lumber Company in Knoxville for the purchase of estimated materials to be used in the remodeling project." *Id.* at 242-43. The defendant "advised 84 Lumber that these materials were being purchased for improvements to [the homeowner's] house." *Id.* at 243. "The proof established that the [defendant] was under no contractual obligation to establish any such account. Moreover, [the homeowner] had no possessory interest in the funds in the account." *Id.* The defendant began renovating the homeowner's basement, but the homeowner grew dissatisfied with the defendant's work and told the defendant to stop work on the project, which he did. *Id.* 84 Lumber returned $1,494.50 to the defendant, the balance of the defendant's 84 Lumber account after the defendant purchased materials. *Id.* The defendant was charged with theft of $6,000, but the trial court granted a partial judgment of acquittal and submitted the case to the jury only in the amount of $1,494.50. *Id.* The jury found the defendant guilty, but on appeal we vacated the defendant's conviction, concluding:

It is undisputed that the appellant lawfully obtained possession of the $6,000 at which time Ms. Reynolds [(the homeowner)] relinquished all of her interest in the money. Moreover, the record is void of any proof that the appellant took possession of the $6,000 with the intent to convert the money to his own use. The proof in the record reflects that the appellant deposited the money in the 84 Lumber account on July 22 and proceeded to the job site on August 1 and began work. On August 3, the appellant discontinued work after an exchange with Ms. Reynolds over poor workmanship. On August 4 or August 5, the appellant was instructed by Ms. Reynolds' attorney not to have any further contact with her. On August 5, the appellant withdrew the $1,494.50. While these facts establish a breach of contract, they fall far short of establishing, beyond a reasonable doubt, any intent to defraud.

"The unifying conception in all [theft] offenses is that each involves the 'involuntary' transfer of property ["or of a legally recognized interest therein," Tenn. Code Ann. § 39–11–106(a)(24)(A)(i) (1991).]," MODEL PENAL CODE § 223.1 (1980), and not the failure to comply with a contractual obligation. The application of the theft statute must be limited in scope to cases defined by the statutory language. The appellant's conduct fails to establish the commission of any offense recognized under our general theft statute. For this reason, the appellant's conviction for theft is reversed and dismissed.

*Id.* at 245 (alteration in original).

In *Hutchinson*, a homeowner contracted with the defendant to place a roof on the homeowner's garage for $5,300. 2011 WL 1621997, at *1. Per the contract, the homeowner would pay the defendant $3,000 up front, with the rest of the payment due upon completion. *Id.* The homeowner gave the defendant a bank envelope containing $3,000 cash at the contract signing on August 9, 2007, but the homeowner never saw the defendant after signing the contract. *Id.* After a month, during which the homeowner tried several times—unsuccessfully—to reach the defendant, the homeowner contacted law enforcement. *Id.* When the homeowner eventually reached the defendant, the defendant said he no longer had the money and that if taken to court, "the [j]udge will just make me pay $15 a month." *Id.* The defendant also told the homeowner "there was nothing the police could do because 'it was a civil case'" and that the homeowner was not the first person to whom defendant had done "this stuff." *Id.* Furthermore, the homeowner's niece, who was dating the defendant, testified that she and the defendant went to a casino the same day the defendant and the homeowner signed their contract, and the defendant gambled using cash from a bank envelope. *Id.* Casino records subpoenaed by law enforcement indicated that the defendant lost $2,950 gambling on August 9 and August 10,

2007. *Id.* at *3. The niece testified that the defendant was not working other roofing jobs at the time he took the homeowner's money, and a sheriff's deputy testified that the defendant told him that he was working on other jobs in Georgia at the time and would be unable to work on the homeowner's roof. *Id.* at *2. The jury found the defendant guilty of theft of $1,000 or more. *Id.* at *3. On appeal, we affirmed, concluding:

> The facts in the present case differ greatly from those in *Amanns*. There was nothing in *Amanns* to suggest that the defendant never intended to complete the work when he took the alleged victim's deposit. However, in this case the Defendant never bought supplies or began work on [the homeowner's] roof. Instead, the evidence at trial established that on August 9, 2007, the Defendant was given $3,000 by [the homeowner] in a bank envelope. The Defendant then took [the homeowner's niece] to Harrah's Casino, where he gambled using money from a bank envelope and lost approximately $3,000. [The niece] testified that the Defendant later admitted that the money was [the homeowner's]. The Defendant rejected [the niece's] offer to buy the supplies needed to complete the job. The Defendant avoided [the homeowner] and only spoke to him after the police had been contacted. When the Defendant spoke to [the homeowner], he told him that he did not have his money and, essentially, that he would never get it back. Additionally, the Defendant lied to Deputy Wilson about what the money was for and why he had not begun work on [the homeowner's] roof. Accordingly, we conclude that the State produced sufficient evidence that the Defendant intended to deprive [the homeowner] of $3,000 when he took the money from [the homeowner].

*Id.* at *5.

Although not a theft case, we find our opinion in a recent appeal of a home improvement services fraud case instructive. In *State v. Pardue*, No. M2023-00227-CCA-R3-CD, 2024 WL 1071976, at *6 (Tenn. Crim. App. Mar. 12, 2024), *no perm. app. filed*, a homeowner and a contractor signed a contract in which the contractor agreed to replace the roof and remove the porch of a mobile home. The contractor and homeowner also "entered into an oral contract to complete an addition after the demolition of the front porch." *Id.* at *2. The homeowner paid the contactor $42,800 in various installments, but the contractor did not finish replacing the roof and the homeowner "had to pay someone else finish the roof." *Id.* at *6. During the contractor's work at the mobile home, the homeowner expressed displeasure with the contractor's work, including his failure to show up to work and his failure to provide receipts for purchases. *Id.* at *2. The contractor signed a promissory note in which he agreed to pay the homeowner $25,000 if "for any reason" he could not complete the contracted work. *Id.* at *3. The trial court found the

contractor guilty of home improvement fraud under Code section 39-14-154(b)(2), which requires proof of "intent to defraud." We reversed the conviction, stating:

> Here . . . there is no proof that Defendant intended to defraud the residential owner. To be fair, there is proof that Defendant did not complete the projects he and the residential owner agreed to, in both written and possibly oral contracts, as evidenced by the residential owner's having to hire someone else to complete the projects. There is also proof that Defendant did substandard work at the residential owner's home. However, during recorded telephone calls, Defendant offered to get receipts from purchases he made for materials and sit down with the residential owner to go over those costs. Moreover, Defendant willingly signed a promissory note agreeing to pay the residential owner $25,000 "if for any reason he's unable to complete the work he's been contracted to do at [the White Bluff home]. This includes the room addition, the front porch, the carport and the walkway to the front porch." Without proof of intent to defraud, however, the evidence is insufficient to support the conviction for home improvement fraud. Because the evidence is insufficient to sustain the conviction for home improvement fraud, we reverse the conviction.

*Id.* at \*6 (alteration in original). Although *Pardue* addressed home improvement fraud rather than theft, that case turned on whether the defendant possessed the intent to defraud. Here, the same issue exists. As in *Pardue*, we conclude that in this case the State failed to prove Defendant intended to defraud Ms. Munk.

The facts of the instant case more closely resemble those of *Amanns* and *Pardue* than those of *Hutchinson*. Here, Ms. Munk paid CountryWide most of the money she owed under the contract, and the plumbing and insulation companies performed work on Ms. Munk's house despite the failure of CountryWide to pay these two subcontractors. In reaching its verdict, the trial court noted Ms. Munk's emails to Defendant that cited subcontractors' difficulties in being paid and that the plumber and insulator were not paid was evidence of "consent obtained by deception" for purposes of the theft statute. However, we respectfully conclude such evidence did not establish, beyond a reasonable doubt, Defendant's intent to deceive Ms. Munk. The evidence established that Ms. Munk did not find out about the plumber's and insulator's not being paid until after she made her last payment to CountryWide on October 28, 2015. The letter from the plumbing company was dated December 2015, and the evidence suggests Ms. Munk did not discover the lien until 2017. Both of these dates are also after the indictment's end date of October 31, 2015. As in *Amanns*, it appears that Ms. Munk stopped paying CountryWide because she was upset over the quality of the work rather than concerns over the plumbers and insulators not being paid.

- 11 -

The facts of this case stand in clear contrast to *Hutchinson*, in which the homeowner paid a contractor for services and the contractor never performed any work on the homeowner's house, instead gambling the homeowner's money away, dodging the homeowner's repeated attempts to contact him, and once contacted essentially telling the homeowner that nothing could be done about the situation. Here, Defendant performed work on Ms. Munk's property and continued to perform work after Ms. Munk brought several issues to his attention—even if the quality of the work was suspect.

Ultimately, the dispute at issue here was a contractual dispute rather than a criminal matter. Arguably, the contractual dispute may have been between Defendant and any subcontractors who were not paid rather than between Defendant and Ms. Munk. Even if Ms. Munk was the aggrieved party, the dispute should have been resolved per the terms of the contract.[3] As in *Amanns*, we conclude, "While these facts establish a breach of contract, they fall far short of establishing, beyond a reasonable doubt, any intent to defraud." 2 S.W.3d at 245. In other words, this was bad business, not theft. Because Defendant's actions did not constitute theft under our criminal code, we vacate Defendant's conviction and dismiss the case.

## B. Defendant's Other Issues

Defendant also argues the trial court lacked subject matter jurisdiction, but cites to no authority regarding a court's exercise of subject matter jurisdiction generally or the statutes establishing the jurisdiction of this court in particular. At oral argument, Defendant conceded that the trial court's subject matter jurisdiction was not genuinely contested. Regardless, we conclude the trial court had subject matter jurisdiction. "[S]ubject matter jurisdiction involves a court's lawful authority to adjudicate a controversy brought before it." *State v. Cawood*, 134 S.W.3d 159, 163 (Tenn. 2000) (citing *Northland Ins. Co. v. State*, 33 S.W.3d 727, 729 (Tenn. 2000)). "In order to determine if a court has jurisdiction, we consider whether or not it had the power to enter upon the inquiry; not whether its conclusion in the course of it was right or wrong." *Id.* (internal quotation omitted, citations omitted).

Defendant also argues that an "Order Dismissing Adversary Proceeding" filed by a federal bankruptcy court in his bankruptcy case—a case in which Ms. Munk was listed as a creditor—served to collaterally estop the State from pursuing criminal charges against him in this case. We agree with the State that Defendant has presented no evidence or authority supporting his contention that the District Attorney General for the Twenty-Third

---

[3] The contract provided that "any dispute or other litigation arising out of or related to this Agreement shall be submitted to binding arbitration in Cheatham County, Tennessee[.]"

- 12 -

Judicial District was "in privity" with the bankruptcy trustee. Nor does the evidence presented by Defendant show that the bankruptcy court's dismissal of Defendant's bankruptcy case establish that the elements of theft were not present in the state court case involving Defendant and Ms. Munk. As stated in the State's brief, Defendant "did not present the underlying record or facts from the bankruptcy proceeding, and the scant documentation he did provide does not include any direct finding as to the defendant's actions in relation to the victim in this case[.]" Defendant has not carried his burden of establishing that the State was collaterally estopped from pursing a criminal conviction in Circuit Court, and thus he is not entitled to relief on this issue.

## III. Conclusion

In consideration of the foregoing and the record as a whole, the judgment of the trial court is reversed. Defendant's conviction is vacated, and the case is dismissed.

_____
MATTHEW J. WILSON, JUDGE