IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs November 18, 2025

## STATE OF TENNESSEE v. TYLER CHRISTIAN

**Appeal from the Criminal Court for Knox County**
**No. 127872   Steven W. Sword, Judge**

_____

### No. E2025-00557-CCA-R3-CD

_____

A Knox County Jury convicted Defendant, Tyler Christian, of two counts of carjacking and one count of driving on a revoked license.  The trial court merged the carjacking convictions and imposed an effective sentence of sixteen years' confinement as a Range II offender.  On appeal, Defendant challenges the sufficiency of the evidence supporting his convictions, the trial court's decision to supplement the pattern jury instructions with definitions of "force" and "violence," and the trial court's denial of Defendant's motion for new trial.  After review, we affirm.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed

MATTHEW J. WILSON, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER, P.J., and CAMILLE R. MCMULLEN, J., joined.

George Edward S. Pettigrew, Knoxville, Tennessee, for the appellant, Tyler Christian.

Jonathan Skrmetti, Attorney General and Reporter; Lacy E. Wilbur, Senior Assistant Attorney General; Charme Allen, District Attorney General; and Takisha Fitzgerald, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

#### Factual and Procedural Background

Defendant and his co-defendant, Elizabeth Terry, were indicted on carjacking by force (Count One) and one count of carjacking by intimidation (Count Two), from their taking a motor vehicle from the victim, Tina McFall, on March 20, 2024.  Defendant was

also charged with driving on a revoked license (Count Three).  Defendant's case proceeded to trial in August 2024, during which the following evidence was presented.

On March 20, 2024, at 12:39 p.m., a passerby called Knox County 911 to report that a woman was "getting beat up and her car . . . stolen" on Locust Street, near Summit Towers in downtown Knoxville.  The caller reported that two people, a man and woman, were dragging another woman out of her car, which the caller described as a white sedan.  The caller then reported that the man and woman drove away in the white sedan down a one-way street known as Cafego Place.  When the caller approached the woman whose car had just been stolen, the woman identified herself as the victim, Tina McFall.   The victim can be heard on the recording of the 911 call describing the attack in the background while the caller relayed the victim's information from the victim to the dispatcher.  On the call, the victim described her car as a white Kia Forte.  The victim said that she knew her attackers, that "she thought they were her friends," and that "she was trying to give them a ride."  The victim identified the man by name as Defendant, adding that his mother lived in Summit Towers.  She described Defendant as having tattoos on his face and long brown hair and carrying a backpack.  The victim identified the woman simply as "Beth" and described her as a biracial female, weighing around 200 pounds and standing five feet, five inches.  The victim reported that she never saw a weapon.  The 911 caller added that she observed the female attacker wearing a gray sweatshirt with a jacket over it.

Knoxville Police Department ("KPD") Officers Dylan Noble and Jason Boston responded to the scene.  Officer Noble testified that he spoke with a security guard at Summit Towers about the incident.  The guard confirmed that a man named Tyler Benjamin Christian and a woman named Elizabeth Nicole Terry had recently been trespassed from Summit Towers.  The guard provided photographs of both people to Officer Noble.  Having confirmed the descriptions and names given by the victim to KPD, Officer Noble issued a "Be On the Look-Out" or "BOLO" for both Defendant and Ms. Terry and relayed this information to Officer Boston.

Officer Boston testified that he recovered surveillance video from a nearby school that showed the attack.  He recorded the video on his cell phone and body-worn camera, both of which were admitted into evidence at trial.  The video showed a man and a woman—each matching the general description given by the victim in the initial 911 call— exit Summit Towers and approach a white car from behind.  The man, who was wearing a backpack, opened the car's driver's door and dragged the victim from the driver's seat.  The man got into the driver's seat while the woman held the victim on the ground.  The victim got up, fighting to regain control of the car.  Defendant then exited the car and pushed the victim a second time.  The woman slammed the victim to the ground before entering the car's back seat. The man and woman then sped away, turning right from Locust Street onto Cafego Place.

- 2 -

At trial, the victim testified that, prior to the carjacking, she received a phone call from Ms. Terry, whom she knew only as "Beth" at the time. Ms. Terry asked the victim to give her and Defendant a ride to a bus stop. The victim agreed to pick the pair up from Summit Towers. The victim had known Defendant for many years and had given him and Ms. Terry a ride "just about every day that week." The victim drove her Kia Forte—a white four-door sedan—to Summit Towers and parked on the corner of Locust Street and Cafego Place. She scrolled on her cell phone as she waited for the pair to come out.

After a few minutes of waiting, the victim noticed Defendant and Ms. Terry in her side-view mirror, approaching her sedan from behind. She testified that she had no cause for concern and that nothing seemed abnormal. She said that Defendant opened her driver's door, but she did not understand what was happening until she was "hit and pulled out of the car." The victim described the attack, saying, "I got thrown on the ground. I was punched . . . I just remember going back to the car, trying -- I just didn't want to lose my car. [O]ne of them would hit me. The other one would hit me. It was a lot of commotion." She further described being thrown to the ground multiple times, testifying, "[t]he last time I got thrown down it was really, really hard." She then watched as the pair "jumped in the car and pulled off." She testified that Defendant was in the driver's seat and Ms. Terry was in the back seat as they sped away. Using the photographs recovered by Officer Noble from the security guard at Summit Towers, the victim identified Defendant and Ms. Terry as her attackers.

The victim further testified that she had known Defendant since he was ten or twelve years old and that they had had a brief romantic relationship when her mother died in August of 2021. The romance ended after only a week, but the two remained friends. She testified that she was aware of his relationship with Ms. Terry and had helped them both, explaining that she previously had allowed the couple to live in her car and provided food for them. The victim said she was not affected by Defendant's relationship with Ms. Terry, explaining, "I was so over him. I liked her more than I liked him."

Over the next seven hours, Knox County 911 received an additional eight calls from various people about the suspects and their movements throughout Knox County. Audio recordings of all the 911 calls were admitted into evidence. At 1:54 p.m., the victim called 911, saying that she was tracking her stolen Kia using the "Find My iPhone" app on her goddaughter's cell phone. During the melee of the incident, she had left her iPhone in the Kia. She relayed to the dispatcher that the car was currently at Zaxby's on East Emory Road in Knox County. The victim testified that she tracked the Kia to four separate locations, relaying each successive location directly to law enforcement officers. She described the route being taken by the Kia as "heading up to . . . the Halls location."

At 2:22 p.m., Rebecca Hamock called 911 to report a motor vehicle crash in the Halls area of Knox County at the intersection of East Emory Road and Andersonville Pike. She reported that a man and woman in a white car struck another man in a black pick-up truck, totaling both vehicles. She further reported that the man and woman were attempting to flee the scene of the crash on foot after asking nearby motorists to give them a ride. At trial, Ms. Hamock testified that she witnessed the woman exit the driver's seat and the man exit the passenger's seat. The woman had a noticeable limp, and Ms. Hamock could tell "she was hurt pretty bad." She testified that after the man stepped out, he reached back into the white car and retrieved a backpack. She observed the man attempt to enter the back seat of a Ford Taurus at the intersection, but when the elderly driver of the Taurus recognized what was happening, she sped away. The pair then began walking towards Halls School on Andersonville Pike. Two photographs showing the pair leaving the scene of the crash were admitted into evidence, and both Ms. Hamock and the victim identified Defendant as the male portrayed in the photographs.

The driver of the black pick-up truck, John David Sneed, testified that he was traveling on Andersonville Pike when he was struck by a white Kia at the intersection of East Emory Road. Mr. Sneed testified that he had the green light and that the white Kia struck the front driver's side of his 2019 Ford F-150 as he was driving through the intersection. As a result of the crash, Mr. Sneed's truck was totaled, and he suffered a broken arm, which required surgery to install a steel plate. At the time of trial, Mr. Sneed continued to suffer from numbness in his hand as a result of the injury.

At 2:55 p.m., a caller, who identified herself as "Amber," phoned 911 and reported "a black guy with a white shirt and a book sack," and a white heavyset female running into the woods near the intersection of East Emory Road and Andersonville Pike. The caller stated that she observed the pair enter the woods about fifteen minutes before she called 911.

KPD Officer Morgan Walton testified that she was on her way to work when she heard a report of a motor vehicle crash on her radio. Officer Walton stopped to assist Knox County deputies with the crash scene. Once she was there, she learned that a man and woman had fled on foot, so she repositioned her unit near the Halls Greenway, just northwest of the crash site, to search for the suspects. Having no success with her search, Officer Walton left the scene and started her regular patrol. Eventually, deputies realized that the white Kia involved in the crash in Halls had been reported stolen from downtown Knoxville earlier that afternoon. Officer Walton returned to the crash site to tow the Kia, accompanied it to the impound lot, and took photographs of the Kia. At trial, the victim identified the Kia as belonging to her.

At 7:20 p.m. that same day, Pamela Smith called 911 and reported that she had been approached by a man and woman on Northgate Drive, approximately one-quarter mile from the crash site. The pair urged her to give them a ride to the hospital, with the man telling Ms. Smith that they had been searching for a lost dog and that his girlfriend had injured her knee during the search. Ms. Smith described the woman as a heavyset, light-skinned black female, wearing gray pants with a dirty white shirt. She described the man has having tattoos "everywhere" with a skinny build and long hair and wearing a white shirt and black pants. Ms. Smith agreed to take the woman to the emergency room at Tennova North Hospital but refused to take the man. When the man persisted in asking for a ride, Ms. Smith stated that she would either take the woman alone or call an ambulance for both of them. The man agreed to stay behind. Ms. Smith reported that this had occurred approximately thirty to forty-five minutes prior to her calling 911. She stated that she called her daughter after dropping the woman off at the hospital. Her daughter told her about the carjacking and car wreck, and after realizing the connection, Ms. Smith reported the encounter to 911. Ms. Smith further reported that she last saw the man walking down East Emory Road towards Tennova North Hospital.

Four minutes prior to Ms. Smith's 911 call, Rebecca Hamock, who witnessed the crash and called 911 earlier in the day, called the Knox County Sheriff's non-emergency number. She reported that she had just left her place of work, a Weigel's convenience store located on the corner of East Emory Road and Dry Gap Pike, when she noticed a man "skipping" down the shoulder of East Emory Road. She reported that he was heading in the direction of the Weigel's, which was located between Northgate Drive and Tennova North Hospital. Ms. Hamock told the dispatcher that this was the same man she saw flee the scene of the car wreck earlier that afternoon. She described the man as wearing a white shirt with long hair pulled into a ponytail and carrying a brown and black backpack. At 7:26 p.m., Ms. Hamock again called 911 to report that the man was now inside the Weigel's and asking directions to Tennova North Hospital. Knox County deputies responded to the Weigel's and placed Defendant into custody. At trial, Ms. Hamock identified Defendant as both the man she saw get out of the white car and flee the scene of the collision earlier in the day and the man who was arrested at Weigel's later that evening.

KPD Officer Walton was again dispatched to assist Knox County deputies when they arrested Defendant at the Weigel's. When she arrived on scene, Defendant was sitting in the back of a deputy's vehicle. Officer Walton testified that Defendant asked her about "his girl," whom he identified as "Elizabeth Terry," and whether "she was okay."

KPD Officer Hayden Marshall testified that he received information from Officer Walton that Ms. Terry may be at Tennova North Hospital. Upon arriving at Tennova North, Officer Marshall provided a description of Ms. Terry to the nursing staff, and they confirmed that a woman matching that description had come into the emergency

department.  The woman identified herself only as "Elizabeth" and refused to give a last name.  Officer Marshall then contacted the woman, who initially told him that her name was Elizabeth Turner.  He was able to confirm that she was, in fact, Elizabeth Terry and placed her under arrest.

The parties entered a written stipulation that Defendant's driver's license had been revoked on the day in question.  After the State rested its case in chief and following a *Momon* hearing, Defendant decided against testifying on his own behalf.  He submitted no proof.

Following the close of proof, the trial court informed the parties that it had added definitions of "force" and "violence" to the pattern jury instructions as related to the charge of carjacking by force.  Defendant objected to the court's use of the definitions, arguing that the jury should rely only on the plain, ordinary meaning of those words because the definitions were not included in the pattern instructions.   The trial court overruled the objection and included the definitions in the final jury instructions, which read in pertinent part:

> Any person who commits the offense of carjacking is guilty of a crime.  For you to find the defendant guilty of this offense, the state must have proven beyond a reasonable doubt the existence of the following essential elements:
>
> (1) that the defendant took a motor vehicle from the possession of another:
>
> As to Count 1: by force
>
> As to Count 2: by intimidation;
>
> and
>
> (2) that the defendant acted either intentionally or knowingly.

The trial court defined "force" as "compulsion by the use of physical power or violence," and "violence" as "evidence of physical force unlawfully exercised so as to damage, injure, or abuse.  Physical contact is not required to prove violence."

The jury convicted Defendant on all three counts as charged in the indictment.  The trial court merged Counts One and Two and imposed a sentence of sixteen years'

confinement with a concurrent sentence of six months on Count Three.[1]  Defendant filed a motion for new trial and a motion for judgment of acquittal, in which he challenged the sufficiency and weight of the evidence and the jury instructions on force and violence.  The trial court denied the motions, and this appeal timely followed.

**Analysis**

On appeal, Defendant challenges the sufficiency of the convicting evidence on all three counts, as well as the trial court's supplemental definitions in the jury instructions. He also challenges the trial court's denial of his motion for new trial.  The State argues that the evidence was sufficient to support the convictions.  The State further argues that Defendant has waived his challenge to the jury instructions and the denial of the motion for trial due to inadequate briefing and that Defendant otherwise failed to establish any error in the jury instructions.

I. Sufficiency of the Evidence

We review a challenge to the sufficiency of the convicting evidence to determine whether, "after viewing the evidence in the light most favorable to the prosecution" and providing the State with "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom," "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (citations omitted); *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011) (citations omitted); Tenn. R. App. P. 13.  Our review "is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both." *State v. Williams*, 558 S.W.3d 633, 638 (Tenn. 2018) (citing *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011)).  Importantly, a guilty verdict removes the presumption of innocence and replaces it with one of guilt on appeal, shifting the burden to the defendant to demonstrate why the evidence is legally insufficient to support the conviction.  *Davis*, 354 S.W.3d at 729 (citing *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011)).

The jury, not this court, resolves all questions involving the credibility of the witnesses, the weight and value to be given to evidence, and the factual disputes raised by such evidence.  *See Dorantes*, 331 S.W.3d at 379 (citing *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008)).  Accordingly, this court will neither re-weigh nor reconsider the evidence when evaluating the sufficiency of the convicting proof.  *State v. Stephens*, 521 S.W.3d 718, 724 (Tenn. 2017).

---

[1] Defendant does not challenge his sentences on appeal.

Tennessee Code Annotated section 39-13-404(a) defines carjacking as "the intentional or knowing taking of a motor vehicle from the possession of another by use of: (1) A deadly weapon; or (2) Force or intimidation." From "the possession of another" is defined in pertinent part as "the person from whom the motor vehicle was taken was in, on, or adjacent to the motor vehicle at the time of the taking . . . ." *State v. Edmondson*, 231 S.W.3d 925, 932 (Tenn. 2007). "Force" is defined as "compulsion by the use of physical power or violence." Tenn. Code Ann. § 39-11-106(a)(14). "Violence" is defined in Tennessee case law as "physical force that is unlawfully exercised or exerted so as to injure, damage, or abuse." *State v. Fitz*, 19 S.W.3d 213, 215 (Tenn. 2000) (quoting Black's Law Dictionary, 6th ed. (1990)). "Compulsion by the use of physical power may indeed be force but it need not be violence." *Id.* at 217 (citation modified).

Defendant's challenge to the sufficiency of the convicting evidence goes largely to its weight. He asks this court to second-guess the jury's credibility determination as to the victim's trial testimony, suggesting that the victim's prior romantic relationship caused her to falsely accuse Defendant and arguing that her testimony conflicts with Ms. Hamock's testimony about who was driving the stolen car. We decline any invitation to revisit the victim's credibility when assessing sufficiency of the evidence because the jury, not this court, resolves all questions involving the credibility of witnesses, the weight and value to be given to evidence, and the factual disputes raised by such evidence. *See Dorantes*, 331 S.W.3d at 379. The jury heard the victim testify about the carjacking and her prior relationship with Defendant, and defense counsel challenged the victim's credibility on both cross-examination and in closing arguments. Despite this, the jury accredited the victim's version of events and rejected the defense theory with its guilty verdicts. Additionally, Ms. Hamock's testimony that Ms. Terry, not Defendant, was driving the car when it wrecked in Halls was more than an hour after the carjacking.

When viewed in a light most favorable to the State, the evidence presented at trial established that Defendant colluded with Ms. Terry to lure the victim to Summit Towers under the guise of helping a friend in need. The pair then forcibly removed the victim from her car by dragging, punching, and pushing her away. Ms. Terry held the victim down while Defendant was gaining control of the car. The victim testified that Defendant urged Ms. Terry to "get" the victim while he entered the driver's seat after they dragged her out of the car. Defendant then drove away in the victim's car with Ms. Terry in the backseat. The victim positively identified both Defendant and Ms. Terry as her attackers and identified her stolen and damaged car after the pair abandoned it after wrecking it in Halls. The victim's testimony was corroborated by the surveillance video, which showed a man and woman leaving Summit Towers and approaching the victim's car before ripping her from the driver's seat. The video also showed Defendant's dragging victim to the ground and shoving her, Ms. Terry's holding the victim on the ground, and Defendant fleeing in

the driver's seat of the victim's car on a public roadway.[2]  Given these facts, a rational jury could have found that Defendant was guilty of carjacking by force and carjacking by intimidation.

Defendant also was charged with driving on a revoked license.  Tennessee Code Annotated section 55-50-504(a)(1) provides: "A person who drives a motor vehicle within the entire width between the boundary lines of every way publicly maintained that is open to the use of the public for purposes of vehicular travel . . . at a time when the person's privilege to do so is . . . revoked commits a Class B misdemeanor."  At trial, Defendant stipulated that his driver's license was revoked on the day of the carjacking, so the State had only to prove that Defendant was driving a motor vehicle on a public roadway.  As outlined above, the same facts support Defendant's conviction for driving on a revoked license.

## II. Jury Instructions

Defendant also challenges the trial court's decision to define "force" and "violence" in the final jury instructions, arguing their inclusion constitutes reversible error because the definitions were not included in the Tennessee Pattern Jury Instructions.  The State argues that Defendant's challenge to the jury instructions has been waived due to insufficient briefing because Defendant failed to cite to the record or supporting authorities.  Alternatively, the State argues that Defendant is not entitled to relief on the merits of his challenge because the instructions were not erroneous.  Initially, we read Defendant's briefing as sufficient to avoid waiver because he clearly identifies the specific jury instructions being challenged and includes some citation to case law in his briefing.  As to the merits, we agree with the State that the trial court did not err in instructing the jury on the definitions of "force" and "violence."

We review the completeness and correctness of jury instructions de novo with no presumption of correctness.  *State v. Clark*, 452 S.W.3d 268, 295 (Tenn. 2014).  "It is well-settled that a defendant has a constitutional right to a complete and correct charge of the law, so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions."  *State v. Dorantes*, 331 S.W.3d 370, 390 (Tenn. 2011); *see also* Tenn. R. Crim. P. 30 (discussing procedure for requesting, objecting, and charging jury instructions).  Indeed, "it is the duty of the trial judge without request to give the jury proper instructions as to the law governing the issues raised."  *Id*. (citation modified).  As part of their instructions, trial courts must describe and define each element of the offense or offenses charged.  *See Clark*, 452 S.W.3d at 295; *State v. Cravens*, 764 S.W.2d 754, 756

---

[2] We note the jury was also instructed on flight, permitting jurors to consider evidence of Defendant's fleeing the scene to infer guilt.

- 9 -

(Tenn. 1989). Pattern jury instructions, while commonly used by trial courts across the state, are merely suggestions and "not officially approved by this Court or by the General Assembly." *State v. Rimmer*, 250 S.W.3d 12, 30 (Tenn. 2008) (citation modified). Thus, pattern jury instructions are not entitled to greater deference than other instructions given by the trial court. *Id.*

Here, the trial court used the statutory definition of "force" and the plain meaning definition of "violence" to describe and define an essential element of Count One, as required by Tennessee precedent. *See Clark*, 452 S.W.3d at 295; *Cravens*, 764 S.W.2d at 756. Count One required the jury to find that Defendant took the victim's car from her possession *by force*. Tennessee Code Annotated section 39-11-106 provides, in relevant part: "'force' means compulsion by the use of physical power or violence and shall be broadly construed to accomplish the purposes of this title." Code section 106(a) is clear that this definition applies to all of Title 39, including the carjacking provision in Code section 39-13-404. *See* Tenn. Code Ann. § 39-11-106(a); § 39-13-404(a).

Because the statutory definition of "force" includes "violence," the trial court defined "violence" as "evidence of physical force unlawfully exercised so as to damage, injure, or abuse" and made clear that "[p]hysical contact is not required to prove violence." Although "violence" is not among the definitions listed in Code section 39-11-106(a), the definition provided in the final jury instructions has been cited with approval by our supreme court in the context of our robbery statute. *See State v. Fritz*, 19 S.W.3d 213, 214 Tenn. 2000) (citing with approval the Black's Law Dictionary definition of violence as "physical force that is unlawfully exercised or exerted so as to injure, damage or abuse.") "When the legislature does not provide a specific definition for a statutory term, [we] may look to other sources, including Black's Law Dictionary, for guidance." *Edmondson*, 231 S.W.3d at 928 (citing as example *Fritz*). The definition of "violence" used in the jury instructions below mirrors the language approved in *Fritz*. Although all violence includes the exertion of force, not all exertions of force rise to the level of violence. *See Fritz*, 19 S.W.3d at 217. Because the definition of force applicable to the carjacking statute encompasses acts of violence, it was appropriate for the trial court to instruct the jury on its plain meaning.

We note that while these definitions may not have been included in the pattern jury instructions at the time of Defendant's trial in August 2024, both definitions have since been added to the pattern instruction for carjacking. Even so, trial courts are not bound by pattern jury instructions. *See Rimmer*, 250 S.W.3d at 30. Instead, trial courts are obliged only to give a complete and correct charge as to the law in a given case. *See Dorantes*, 331 S.W.3d at 390. This is precisely what the trial court did here. Accordingly, we discern no error in the trial court's use of these definitions in the final jury instructions.

- 10 -

### III. Motion for New Trial

Finally, Defendant challenges the trial court's denial of his motion for new trial. The State argues that the challenge is waived for inadequate briefing. In his brief, Defendant refers to his arguments from his sufficiency and jury instruction challenges as bases for the trial court's perceived errors. As stated above, we have concluded that there was sufficient evidence for Defendant's convictions, and that the trial court did not err in instructing the jury. As such, the trial court properly denied Defendant's motion for new trial, and he is not entitled to relief.

### Conclusion

For the foregoing reasons, we affirm the judgments of the trial court.

s/ Matthew J. Wilson
MATTHEW J. WILSON, JUDGE